Mary E. QUARTERMAN, as Next Friend of her minor son, Charles C. Quarterman, Appellant,

v.

F. D. BYRD, individually and as Superintendent of the Cumberland County Schools and his successors, et al., Appellees.

No. 71–1282.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1971.

Decided Nov. 26, 1971.

James E. Keenan, Durham, N. C. (Paul & Keenan, Durham, N. C., on brief), for appellant.

Cyrus Faircloth, Fayetteville, N. C., of counsel (Lester G. Carter, Jr., of Carter & Faircloth, of counsel, and James R. Nance, Sr., and Nance, Collier, Singleton, Kirkman & Herndon, Fayetteville, N. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and WINTER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

At the time of the commencement of this action, the plaintiff was a tenth-grade high school student at Pine Forest High School near Southern Pines, North Carolina.

Among the regulations of Pine Forest High School were the following, designated as General School Rules 7 and 8:

"7. Each pupil is specifically prohibited from distributing, while under school jurisdiction, any advertisements, pamphlets, printed material, written material, announcements or other paraphernalia without the express permission of the principal of the school.

"8. All students shall be subject to suspension or dismissal by the principal, who willfully and persistently violate the rules of the school, or who may be guilty of immoral or disreputable conduct, during school term or out of school term whether on school property or not, or who may be a menace to the school as by law provided."

Authority to punish under such rules was authorized under North Carolina General Statute, Sections 115–147.[1]

On November 19, 1970, the plaintiff violated Rule 7, as quoted *supra,* by distributing in school an "underground" newspaper. For such infraction, he was suspended for ten school days and placed on probation. Some two months later, on January 29, 1971, he again distributed without permission, in violation of the school rule, an "underground" paper in which one of the articles concluded in large capital letters with this statement:

" . . . WE HAVE TO BE PREPARED TO FIGHT IN THE HALLS AND IN THE CLASSROOMS, OUT IN THE STREETS BECAUSE THE SCHOOLS BELONG

---

1. "G.S. § 115–147: *Power to suspend or dismiss pupils.* The principal of a school shall have authority to suspend or dismiss any pupil who wilfully and persistently violates the rules of the school or who may be guilty of immoral or disreputable conduct, or who may .be a menace to the school: Provided, any suspension or dismissal in excess of 10 school days and any suspension or dismissal denying a pupil the right to attend school during the last 10 school days of the school year shall be subject to the approval of the county or city superintendent. * * * Every suspension or dismissal for cause shall be reported at once to the superintendent and to the attendance counselor, who shall investigate the cause and deal with the offender in accordance with rules governing the attendance of children in school."

TO THE PEOPLE. IF WE HAVE TO—WE'LL BURN THE BUILDINGS OF OUR SCHOOLS DOWN TO SHOW THESE PIGS THAT WE WANT AN EDUCATION THAT WON'T BRAINWASH US INTO BEING RACIST. AND THAT WE WANT AN EDUCATION THAT WILL TEACH US TO KNOW THE REAL TRUTH ABOUT THINGS WE NEED TO KNOW, SO WE CAN BETTER SERVE THE PEOPLE!!!"

On account of this second violation, he was again suspended for ten school days.

At this point, the plaintiff, suing both individually and as a representative of a class, began this action, seeking both a declaratory judgment that Rule 7 was violative of his First Amendment rights and a temporary and permanent injunction against the enforcement of his suspension and any other punishment for his violation of such rule, as well as damages. Following the filing of this action, he applied to the District Court for temporary injunctive relief pending the disposition of the cause. The District Court denied the application and proceeded to stay the action until there had been an exhaustion of State administrative and judicial remedies by the plaintiff. From this order, the plaintiff has appealed to this Court. Incident to such appeal, he applied to Honorable J. Braxton Craven, Jr., Circuit Judge, under Rule 8, for injunctive relief pending the appeal. Judge Craven granted such relief, but added:

"Provided, however, that nothing contained herein shall be construed to prevent school authorities from enforcing discipline and preventing disruption of classes and other school activities, and to implement such purposes school authorities may, if so advised, prevent distribution of printed material during classes and at other times and places where such distribution is reasonably thought to be disruptive of normal school activity."

We vacate the stay of proceedings entered by the District Court, grant declaratory judgment and sustain injunctive relief as against the application of Rule 7 as presently drafted.

## I.

■ The contention that this action, primarily for a declaratory judgment of the unconstitutionality of the school rule, should be stayed pending exhaustion of State remedies is without merit. Were the issue simply a matter of discretionary school discipline, we might, recognizing that "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint",[2] appropriately defer to the "expertise" of the school authorities and remand the plaintiff to his administrative remedies within the school hierarchy. Press v. Pasadena Independent School District (D.C. Tex.1971) 326 F.Supp. 550, 565. Even if the issue were whether the content of the challenged publication justified a judgment of "disruptive potential" sufficient to remove First Amendment protection against prior restraint, we would be inclined to give great, though not final, weight to the opinion of the school authorities. This is so because it is not the policy of Federal Courts to "intervene in the resolution of conflicts which arise in the daily operation of the school systems and which do not directly and sharply implicate basic constitutional values." Epperson v. Arkansas, *supra* (393 U.S. at p. 104, 89 S.Ct. at p. 270). Actually, Tinker v. Des Moines School Dist. (1969) 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731, the leading case on student constitutional rights, "emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." And in prescribing general conduct within the school, the school authorities must "have a wide latitude of

2. Epperson v. Arkansas (1968) 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228.

discretion, subject only to the restriction of reasonableness." Davis v. Ann Arbor Public Schools (D.C.Mich.1970) 313 F. Supp. 1217, 1226; Barker v. Hardway (D.C.W.Va.1968) 283 F.Supp. 228, 235, aff. 4 Cir., 399 F.2d 638, cert. den. 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217. But the issue posed by the plaintiff in this case as to the validity of the rule is not a simple matter of school discipline; it is not related to any question of state law; it deals "directly" and "sharply" with a fundamental constitutional right under the First Amendment. That constitutional claim under the Federal Constitution, as Judge Craven observed in his order granting injunctive relief pending appeal, is properly justiciable in the federal courts. School administrative procedures provide no satisfactory alternative for the resolution of such federal constitutional claim, and the plaintiff's choice of a federal forum instead of the state forum in a suit filed under Section 1983, U.S.C., is to be respected. The District Court accordingly erred in staying this action and requiring an exhaustion of State remedies, preliminary to any right to vindicate federal constitutional claims in a federal court. Section 1983, 42 U.S.C.; Monroe v. Pape (1961) 365 U.S. 167, 183, 81 S. Ct. 473, 5 L.Ed.2d 492; McNeese v. Board of Education (1963) 373 U.S. 668, 671–674, 83 S.Ct. 1433, 10 L.Ed.2d 622; Lewis v. Kugler (3d Cir. 1971) 446 F.2d 1343, 1346.

## II.

Though it might well be argued that the language in the publication distributed by the plaintiff on January 29, 1971, as quoted *supra*, was inflammatory and potentially disruptive,[3] the plaintiff was not disciplined because of the content of the publication but because he had violated the regulation prohibiting the distribution of printed material without permission.[4] We are, therefore, not called upon in this appeal to assess the content of the publication; we are concerned only at this point with the constitutional validity of the regulation, for violation of which the plaintiff was disciplined.[5]

## III.

The regulation, assailed by plaintiff, is facially invalid. Its basic vice does not lie in the requirement of prior permission for the distribution of printed material, though such requirement is manifestly a form of prior restraint of censorship. Free speech under the First Amendment, though available to juveniles and high school students, as well as to adults, is not absolute and the extent of its application may properly take into consideration the age or maturity of those to whom it is addressed. Thus, publications may be protected when directed to adults but not when made available to minors,[6] or,

---

3. Compare, Norton v. Discipline Committee of East Tenn. State Univ. (6th Cir. 1969) 419 F.2d 195, 198, cert. den. 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562, where language perhaps less inflammatory than that in this case was found to be "an open exhortation to the students to engage in disorderly and destructive activities", with Scoville v. Board of Ed. of Joliet Tp. H. S. Dist. 204, etc., Ill. (7th Cir. 1970) 425 F.2d 10, cert. den. 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55. It should be noted that, while the school rules were freely criticized in *Scoville*, there was no exhortation to violate such rules.

4. Freedom of the press extends to distribution as well as to writing or printing.

Talley v. California (1960) 362 U.S. 60, 64, 80 S.Ct. 536, 4 L.Ed.2d 559; cf., Breard v. Alexandria (1951) 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233.

5. Cf., Riseman v. School Committee of City of Quincy (1st Cir. 1971) 439 F.2d 148: "The denial (of the right of students to distribute) was not based on the nature of the materials sought to be distributed, but on a refusal to change the existing School Committee regulation, * * *".

6. See Prince v. Massachusetts (1944) 321 U.S. 158, 170, 64 S.Ct. 438, 88 L.Ed. 645; Ginsberg v. New York (1968) 390 U.S. 629, 638, 88 S.Ct. 1274, 20 L.Ed.2d 195; Tinker v. Des Moines School Dist., *supra* (393 U.S. 503, 89 S.Ct. 733) concurring opinion of Justice Stewart (p.

as Justice Stewart emphasized it in his concurring opinion in *Tinker*, First Amendment rights of children are not "co-extensive with those of adults". Similarly, a difference may exist between the rights of free speech attaching to publications distributed in a secondary school and those in a college or university.[7] It is generally held that the constitutional right to free speech of public secondary school students may be modified or curtailed by school regulations "reasonably designed to adjust these rights to the needs of the school environment." Antonelli v. Hammond (D.C.Mass.1970) 308 F.Supp. 1329, 1336.[8] Specifically, school authorities may by appropriate regulation, exercise prior restraint upon publications distributed on school premises during school hours in those special circumstances where they can "reasonably 'forecast substantial disruption of or material interference with school activities' " on account of the distribution of such printed material.[9] If a reasonable basis for

---

515, 89 S.Ct. 733), and dissenting opinion of Justice Black (p. 521, 89 S.Ct. p. 744), to the effect that high school pupils do not carry with them into the school "a complete right to freedom of speech and expression."

See, Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 938–9, (1963), cited with approval in *Ginsberg:*

"School authorities * * * may impose more stringent regulations upon the constitutional rights of minors than upon those of adults. * * * the power of the state to control the conduct of children reaches beyond the scope of its authority over adults."

7. Trager, Freedom of the Press in College and High School, 35 Albany L.Rev. 161, 166 (1971) ; Press v. Pasadena Independent School District (D.C.Tex.1971) 326 F.Supp. 550, 565, note 9.

See, also, Schwartz v. Schuker (D.C. N.Y.1969) 298 F.Supp. 238, 242 :

"A special note should be taken that the activities of high school students do not always fall within the same category as the conduct of college students, the former being in a much more adolescent and immature stage of life and less able to screen fact from propaganda."

Note, Developments in the Law: Academic Freedom, 81 Harv.L.Rev. 1045, 1128–29 :

"With few exceptions—most notably certain programs conflicting with religious freedom—rules and disciplinary measures administered at elementary or secondary levels have not been thought to violate pupils' constitutional liberties ; * * *."

8. See, Haskell, Student Expression in the Public Schools: Tinker Distinguished, 59 The Georgetown L.Journal, 37, 57–8 (1970) :

"It seems reasonable that the constitutional limits on student expression in the schoolhouse may be different from those in the community at large, because there are different elements in balancing the private and public interests involved. The school environment is unique due to its physically confining nature, the immaturity of its population and the special demands and needs of the educational purpose.

"Obviously those limits to expression applicable to society generally are also applicable to the schoolhouse. Given the peculiar nature and purpose of the school environment, it seems that the school administrator should have the discretion to impose somewhat more restrictive limits where he deems it advisable or necessary. * * * Rigid constitutional constraints imposed by a judiciary untrained in the problems of operating public schools would have the effect of precluding the exercise of prudent judgment by those knowledgable and trained in public school administration."

See, also, dissenting opinion of Justice Harlan in *Tinker* (393 U.S. p. 526, 89 S.Ct. p. 747) that, in any attack on the school authority's discretion, the student must assume the burden of showing that a "particular school measure was motivated by other than legitimate school concerns—for example, a desire to prohibit the expression of an unpopular point of view, while permitting expression of the dominant opinion."

9. Eisner v. Stamford Board of Education (2d Cir. 1971) 440 F.2d 803, 806–807 ; Chaplinsky v. New Hampshire (1942) 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031.

A similar rule prevails where the printed material is obscene. Close v. Lederle (1st Cir. 1970) 424 F.2d 988, 990, cert. den., 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 ; Baker v. Downey City Board of Education (D.C.Cal.1969) 307

such a forecast exists, it is not necessary that the school stay its hand in exercising a power of prior restraint "until disruption actually occurred." Butts v. Dallas Independent School District (5th Cir. 1971) 436 F.2d 728, 731; Norton v. Discipline Committee of East Tenn. State Univ., *supra*, 419 F.2d at p. 199. The school authorities are not required to "wait until the potential (for disorder) is realized before acting." LeClair v. O'Neil (D.C.Mass.1969) 307 F.Supp. 621, 625, aff. 401 U.S. 984, 91 S.Ct. 1219, 28 L.Ed.2d 524. And if there are substantial facts which reasonably support a forecast of likely disruption, the judgment of the school authorities in de-

nying permission and in exercising restraint will normally be sustained. Butts v. Dallas Independent School District, *supra*.[10]

What is lacking in the present regulation, and what renders its attempt at prior restraint invalid, is the absence both of any criteria to be followed by the school authorities in determining whether to grant or deny permission, and of any procedural safeguards in the form of "an expeditious review procedure" of the decision of the school authorities. The order of Judge Craven, granting the plaintiff relief pending appeal from the order of suspension, added in the paragraph already quoted, a

F.Supp. 517, 526–527; but, cf., Keefe v. Geanakos (1st Cir. 1969) 418 F.2d 359; Vought v. Van Buren Public Schools (D. C.Mich.1969) 306 F.Supp. 1388, 1392.

The American Civil Liberties Union, in its bulletin, Academic Freedom in the Secondary Schools (at 11–12) phrases the right of prior restraint, as applied to high school students, thus:

"Neither the faculty advisors nor the principal should prohibit the publication or distribution of material except when such publication or distribution would clearly endanger the health or safety of the students, or clearly and imminently threaten to disrupt the educational process, or might be of a libelous nature. Such judgment, however, should never be exercised because of disapproval or disagreement with the article in question."

This statement is quoted in Abbott, The Student Press: Some First Impressions, 16 Wayne L.Rev. 1, 22 (1970).

Cf., opinion of Justice Fortas in *Tinker*, where in summarizing his conclusions, he said:

"* * * the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." (393 U.S. at p. 514, 89 S.Ct. at p. 740).

As a matter of fact, the defect in the District Court's decision in that case was in the judgment of the prevailing opinion that it "made no such finding".

10. See, Goldstein, The Scope and Sources of School Board Authority to Regulate Student Conduct and Status: A Noncon-

stitutional Analysis, 117 U.Pa.L.Rev. 373, 429 (1969):

"Judicial review should be limited to a determination, whether, on the basis of this record as a whole, there is substantial evidence to support the school board's finding of a reasonable likelihood of harm."

See, also, Note, 52 Marquette L.Rev. 606, 611:

"Note that *Tinker* involved the reasonable anticipation of a level of disruption insufficient to warrant curtailment of speech. * * * The opinion goes no further than to imply that such anticipation need only be not unreasonable."

It has been suggested that Courts may well take note of the significant differences between symbolic speech, especially when directed towards a non-school matter, and the distribution of an underground newspaper in assessing the reasonableness of a judgment of likely school disruption. Thus, in Nahmod, Black Arm Bands and Underground Newspapers: Freedom of Speech in the Public Schools, 51 Chicago Bar Record, 144, 148–9 (1969), the author states:

"*Tinker* and *Burnside* [Burnside v. Byars, 5 Cir., 363 F.2d 744] involved worn symbols which were viewed by comparatively few students, while underground newspapers have a theoretically unlimited student readership and thereby a potentially more disruptive influence. In addition, *Tinker* and *Burnside* involved expressions of opinion on a non-school, albeit controversial, matter, while underground newspapers which engage in attacks on school administrators and their policies would seem to affect school discipline more directly."

guideline which follows broadly the ruling in *Tinker* in establishing a reasonable criterion for measuring the extent of the school's power of restraint. Such language is not as precise as that which might be required in a criminal statute; but no such exacting standard is necessary in formulating school regulations. Esteban v. Central Missouri State College (8th Cir. 1969) 415 F.2d 1077, 1089–1090, cert. den. 398 U.S. 965, 90 S. Ct. 2169, 26 L.Ed.2d 548. Even with the addition of such guideline, however, the regulation does not provide the procedural safeguards mandated by Freedman v. Maryland (1965) 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, as modified to take into account what *Eisner, supra,* refers to as the practical problems involved in applying *Freedman* to the school environment. *Eisner,* which involved largely the same issue as is presented here, set forth the reasonable requirements for "an expeditious review procedure" that are practical as applied in connection with the operation of a public school and that will meet the basic requirements of *Freedman.* (440 F.2d at pp. 810–811) As we have said, the regulation involved in this action includes neither such limited procedural safeguards nor any guidelines for determining the right to publish or distribute and is accordingly constitutionally defective.

It follows that the plaintiff was entitled to declaratory judgment that, as presently framed, the regulation is invalid and its subsequent enforcement should have been enjoined.

### V.

The plaintiff, also, asks that his suspension be voided and expunged from his school record. Actually, the suspension was not enforced, since the order of Judge Craven restrained its imposition. The school year has now ended. The issue of the suspension itself has accordingly become moot.[11] Since the suspension was never enforced, it will not sup-

---

11. A number of cases, concerned with the alarming rise in school disciplinary problems, have held that a high school student may be punished for gross disobedience of school rules and gross disrespect of school authorities, without regard to the constitutionality of the rule or the action of the school official. Schwartz v. Schuker, *supra,* 298 F.Supp. at p. 242; Hatter v. Los Angeles City High School District (D.C.Cal.1970) 310 F.Supp. 1309, 1311–1312; Graham v. Houston Independent School District (D.C.S.D.Tex.1970) 335 F.Supp. 1164 (opinion by Hon. Joe Ingraham, Circuit Judge, sitting by designation); cf., however, Scoville v. Board of Ed. of Joliet Tp. H. S. *Dist.* 204, etc., Ill., *supra* (425 F.2d 10; Sullivan v. Houston Independent School District (D.C.Tex.1969) 307 F.Supp. 1328; and Dickey v. Alabama State Board of Education (D.C.Ala.1967) 273 F.Supp. 613. All the cases are reviewed and the rule in *Schwartz* approved in Haskell, Student Expression in the Public Schools: Tinker Distinguished, 59 The Georgetown L. Journal 37 (1970). The *Schwartz* case, and those cases adopting its view, proceed on the theory that the student has a legal way to test the validity of a school regulation and there is accordingly no reason for him to disregard the school regulation or to flaunt school discipline. Recognizing the danger in insulating students from discipline for a flagrant violation of a school regulation, which has not been legally declared invalid, these cases are motivated by the real fear, expressed by Justice Black in his dissent in *Tinker,* that, under any other ruling, high school students "will be ready, able, and willing to defy their teachers on practically all orders." (393 U.S. at p. 525, 89 S.Ct. at p. 746.) It cannot be denied that to permit high school students to determine for themselves the validity of school rules, and to reward with impunity their impatience with school regulations—even those which later may be found improper—undermines school discipline and can interfere with the orderly operation of the school. Moreover, even though the school authorities might be enjoined from the exercise of a right of prior restraint over the distribution of printed material, it does not follow that the student might not be properly punished or disciplined on account of the actual distribution, if the material warrants a reasonable forecast of disruption in the school. See concurring opinion of Justice White in New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822, filed June 30, 1971. In short, those who enjoy freedom from prior restraint "are answerable for any abuse thereof." Note, Freedom of the Press in College and High School, 35 Albany L.Rev. 161, 163 (1971).

port an award of damages but it would seem proper, in these particular circumstances, to expunge it from the plaintiff's record.

Accordingly, the Order of the District Court is vacated and the cause is remanded to the District Court for the entry of relief in accordance with the views herein expressed.

Davis, Judge, Court of Claims, dissented and filed opinion.