**Arline NITZBERG, as parent and on behalf of Sam Nitzberg, a minor, et al., Appellants,**

v.

**H. Emslie PARKS, President, Board of Education of Baltimore County, et al., Appellees.**

**No. 74–1839.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1975.

Decided April 14, 1975.

Barbara Gold, American Civ. Liberties Union, Maryland Affiliate, Baltimore, Md., for appellants.

R. Bruce Alderman, County Sol., Eugene G. Ricks, Asst. County Sol. for the Bd. of Ed. of Baltimore County, Maryland, G. Warren Mix, Asst. County Sol., for appellees.

* Sitting by Designation.

1. One of the papers, *The Woodlawn Lampoon*, for example, was banned from the high school because of an article about cheerleaders which apparently described them as "sex objects". School administrators called the article "obscene" and "demeaning" to the school, and threatened to suspend the students if they put out another issue. While we see no connection between the phrase "sex objects" and obscenity (or, for that matter, demeaning behavior), we need not here undertake an assessment of the content of this newspaper or its companion, *Today's World*, since the present controversy involves only the facial constitutionality of the school board's regulations.

Before CLARK, Supreme Court Justice,* HAYNSWORTH, Chief Judge, and BRYAN, Senior Circuit Judge.

Mr. Justice CLARK:

This civil rights action under 42 U.S.C. § 1983 was brought in United States District Court after school officials of the Woodlawn Senior High School in Baltimore Co., Maryland, ordered two private student newspapers to cease publication in November of 1973. Appellants, the student publishers of the newspapers and their parents, alleged that Rule No. 5130–1—the Baltimore County Board of Education's statement of "Students' Rights and Responsibilities"—violated the First and Fourteenth Amendments insofar as it authorized prior restraint of "non-school literature."

▇ The case proceeded on stipulated facts, none of which are relevant to our resolution of this matter.[1] The sole question is whether on its face Rule 5130–1 as presently stated meets the constitutional standards set forth in this Circuit's precedents, *Quarterman v. Byrd*, 453 F.2d 54 (1971), and *Baughman v. Freienmuth*, 478 F.2d 1345 (1973). We hold that it does not.[2]

After the filing of this suit in December of 1973, the Baltimore County school board reexamined its original regulations governing on-campus distribution of non-school sponsored literature and produced a second version on January 24, 1974.

2. The Supreme Court's recent decision in *Board of School Commissioners v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), presents no impediment to our consideration of this case. In *Jacobs*, the Court dismissed a complaint alleging an almost identical constitutional violation because the pending case had become moot as a result of the graduation of the named plaintiffs and their failure to have had a class action properly certified under Fed.R.Civ.P. 23. Here, though no effort was made to certify a class, it is stipulated by the parties that Richard Smith, one of the named plaintiffs, is currently a junior at Woodlawn Senior High School and is expected to be in attendance for another full school year. A live case or controversy therefore exists.

The district court, however, found the new rules vague and overbroad and, in an opinion filed February 25, 1974, gave the Board two weeks to meet constitutional standards. On March 26, 1974, the district court reviewed the Board's third version, again found them wanting, and enjoined the Board from enforcing the rules. On May 17, 1974, the court continued the injunction and ordered revision of the fourth version. The Board again redrafted its rules, and on May 30, 1974, the district court approved the regulations and dissolved the injunction. This appeal followed.

Rule 5130.1(b) contains the Board's present policies regarding student publications and states in relevant part:

> Literature may be distributed and posted by the student of the subject school in designated areas on school property as long as it is not obscene or libelous (as defined below) and as long as the distribution of said literature does not reasonably lead the principal to forecast substantial disruption of or material interference with school activities.
>
> If a student desires to post or make a distribution of free literature which is not officially recognized as a school publication, the student shall submit such non-school material to the principal for review and prior approval. In exercising this right of prior restraint, principals shall follow the procedures specified in this policy. The principal shall render a decision and notify the student within two (2) pupil days of such submission. If the decision is in the negative, the principal shall state his reasons to the student in writing. During this period of review, any supply of the material may be retained by the student or may be left with the principal for safekeeping. Distribution of such material during the review and appeal period, or following a negative decision, shall be sufficient grounds for confiscation of such material and suspension of the student by the principal. If the student is dissatisfied with the decision of the principal with respect to the distribution of a non-school publication, the student may appeal this decision to the appropriate area assistant superintendent who shall render a decision, stating his reasons in writing, within three (3) pupil days of such appeal. If an administrator fails to act within the time periods specified in this paragraph, the student(s) who submitted the literature for review may distribute same. (Appeal from a decision of an assistant superintendent is to the superintendent of schools and thence to the Board of Education at the time of its next regularly scheduled meeting.)

The accompanying definitions of "libel or libelous material", "obscene or obscenity", and "distribution" are set forth in the margin.[3] Appellants contend that

---

3. 1. Libel or libelous material—

The First Amendment of the Constitution of the United States protects the right of free expression by an individual, either in writing or in speech, on all matters of public or general concern about a person, without regard to whether such person is famous or anonymous, in whom the community and press have a legitimate and substantial interest because of who he is or what he has done. However, a written or oral statement about such a person which is made with "actual malice," that is, with knowledge that it was false or with reckless disregard of whether it was false or which was made with a high degree of awareness of its probable falsity, is subject to sanction and is not protected by the First Amendment of the Constitution.

A statement is libelous and not protected by the First Amendment if it is made with "actual malice" and if it tends to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or if it induces an evil opinion of one in the minds of right-thinking persons, or if it causes one to be shunned and avoided in society.

2. Obscene or obscenity—

The average person, applying contemporary community standards would find that it, taken as a whole, appeals to prurient interest;

It depicts or describes, in a patently offensive way, sexual conduct currently defined by Maryland law [27 Anno. Code of Md. §§ 416, 417];

Taken as a whole, it lacks serious literary, artistic, political or scientific value.

these regulations, detailed though they may seem, remain unconstitutionally vague and overbroad. We begin by restating the law of this Circuit in regard to such claims.

The controlling constitutional principles in student publication cases for this Circuit have been set forth by Judge Russell in *Quarterman v. Byrd*, 453 F.2d 54 (4th Cir. 1971), as follows:

Free speech under the First Amendment, though available to juveniles and high school students, as well as to adults, is not absolute * * *. [A]s Justice Stewart emphasized it in his concurring opinion in *Tinker* [*v. Des Moines School Dist.*, 393 U.S. 503, 515, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)], First Amendment rights of children are not "co-extensive with those of adults". Similarly, a difference may exist between the rights of free speech attaching to publications distributed in a secondary school and those in a college or university. It is generally held that the constitutional right to free speech of public secondary school students may be modified or curtailed by school regulations "reasonably designed to adjust those rights to the needs of the school environment." * * * Specifically, school authorities may by appropriate regulation, exercise prior restraint upon publications distributed on school premises during school hours in those special circumstances where they can "reasonably 'forecast substantial disruption of or material interference with school activities'" on account of the distribu-

tion of such printed material. [453 F.2d at 57–58 (footnotes omitted)].

Subsequently, in *Baughman v. Freienmuth*, 478 F.2d 1345 (4th Cir. 1973), Judge Craven re-emphasized the necessity of "narrow, objective, and reasonable standards" as the essential element in any scheme which required prior submission of material for approval before distribution and summarized the constitutional requirements as follows:

(a) Secondary school children are within the protection of the first amendment, although their rights are not coextensive with those of adults.

(b) Secondary school authorities may exercise reasonable prior restraint upon the exercise of students' first amendment rights.

(c) Such prior restraints must contain precise criteria sufficiently spelling out what is forbidden so that a reasonably intelligent student will know what he may write and what he may not write.

(d) A prior restraint system, even though precisely defining what may not be written, is nevertheless invalid unless it provides for:

(1) A definition of "Distribution" and its application to different kinds of material;

(2) Prompt approval or disapproval of what is submitted;

(3) Specification of the effect of failure to act promptly; and,

(4) An adequate and prompt appeals procedure.

[478 F.2d at 1351.]

---

The Supreme Court has set forth the following examples of what types of materials can be prohibited as obscene:
 "(a) Patently offensive representations of descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
 (b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." (*Miller v. California* [413 U.S. 15 at 25], 93 S.Ct. [2607] at 2615 [, 37 L.Ed.2d 419]) These examples are adopted herewith as part of this policy.

3. Distribution—
A substantial dissemination of literature in any form which is thus made generally available to students. This includes the posting of literature in areas of a school which are generally frequented by students. The principal will require submission of literature for prior review when there is to be such a substantial distribution of literature, so that it can be reasonably anticipated that in a significant number of instances there would be a likelihood that the distribution would disrupt school operations, or in order to determine whether such material is libelous or obscene as defined in this policy.

*Accord Eisner v. Stamford Board of Education*, 440 F.2d 803 (2d Cir. 1971) (Kaufman, J.).

 It is clear that Rule 5130.1(b) was intended to come within the exception to the ban on prior restraints suggested in *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). There the Court appeared to recognize the right of school administrators to block the distribution of literature which would substantially disrupt school work and discipline. Despite the protest of commentators, *see* Note, "Prior Restraints in Public High Schools," 82 Yale L.J. 1325 (1973), the Circuits which have dealt with the issue—with the exception of the Seventh—have accepted this interpretation of *Tinker. See Riseman v. School Committee of Quincy*, 439 F.2d 148 (1st Cir. 1971); *Eisner v. Stamford Board of Education*, 440 F.2d 803 (2d Cir. 1971); *Quarterman v. Byrd*, 453 F.2d 54 (4th Cir. 1971); *Shanley v. Northeast Ind. Sch. Dist., Bexar County, Tx.*, 462 F.2d 960 (5th Cir. 1972); *contra Fujishima v. Board of Education*, 460 F.2d 1355 (7th Cir. 1972). Applying this test, we find the challenged regulation to be improperly drawn in several respects.

The central paragraph in Rule 5130.-1(b) states that:

Literature may be distributed . and posted by the student of the subject school in designated areas on school property as long as it is not obscene or libelous (as defined below) and as long as the distribution of said literature does not reasonably lead the principal to forecast substantial disruption of or material interference with school activities.

A crucial flaw exists in this directive since it gives no guidance whatsoever as to what amounts to a "substantial disruption of or material interference with" school activities; and, equally fatal, it fails to detail the criteria by which an administrator might reasonably predict the occurrence of such a disruption. Though the language comes directly from the opinion in *Tinker*, we agree with Judge Fairchild's remark in *Jacobs v. Board of School Commissioners*, 490 F.2d 601 (7th Cir. 1973), vacated as moot, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), that:

It does not at all follow that the phrasing of a constitutional standard by which to decide whether a regulation infringes upon rights protected by the first amendment is sufficiently specific in a regulation to convey notice to students or people in general of what is prohibited. [490 F.2d at 605 (footnote omitted).]

In addition, we note that the definition of "libelous" material contained in Rule 5130.1(c) fails to apply the standard of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. On its face, therefore, the Board's regulations are void for vagueness and overbreadth. In addition, we notice that there are other flaws which must be corrected, if Rule 5130.1 is to pass constitutional muster.[4]

██ In *Baughman*, this Circuit made it quite plain that a prior restraint procedure, to be valid, must provide prompt and adequate review. Here, the procedures to be followed by the school administration are unclear. A principal must render a decision on a proposed publication within two "pupil days"; and

---

**4.** For example, the regulation curiously appears to require the prior approval only of "free" student literature which is not officially recognized as a student publication. We can perceive no constitutional basis for distinguishing between commercial literature and "free" literature. Also, we find no clear purpose in the inclusion of Maryland's criminal statutes on obscenity in sections (d), (e), and (f) of Rule 5130.1. Finally, we have some doubts about the adequacy of the publication provision of Rule 5130.1(b), since it merely requires that "a copy of this policy shall be made available to all students in a readily accessible and announced location in each school building." We believe that a more effective notice would be attained through inclusion in official publications of the school or circulated to students in the same manner as other official materials, circulars, or bulletins.

the assistant superintendent who reviews the principal's decision must render his decision within three "pupil days". Nowhere is the term "pupil days" defined. More importantly, no time limit whatever is specified for an appeal from the assistant superintendent's decision to the superintendent, and ultimate review by the school board is permitted only "at the time of its next regularly scheduled meeting." Such protracted steps in the appeals procedure are obviously incompatible with the quick disposition so necessary in free speech cases.

We also believe that the nature of the review itself has been left too vague. The regulations call for the student desiring to distribute literature to "submit" the material to the principal. One would expect that such a submission would include the right of the student to appear and present his case, yet such a right is not specifically acknowledged at any point in the review process. Since the regulations specify that "Distribution of [non-school] material during the review and appeal period, or following a negative decision, shall be sufficient grounds for confiscation of such material and suspension of the student by the principal," elementary due process requires confrontation and a hearing of some type before a step as drastic as suspension is taken.[5] As the Supreme Court recently said in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975):

> [I]t would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his defalcation and to let him tell his side of the story in order to make sure that an injustice is not done. * * *

We do not believe that school authorities must be totally free from notice and hearing requirements if their schools are to operate with acceptable efficiency * * * [D]ue process requires, in connection with a suspension of ten days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. [419 U.S. at 580, 95 S.Ct. at 739.]

This is the third time that this circuit has been confronted with the free speech aspects of secondary public school regulations and found it necessary to intervene in the conduct of such matters by the local school authorities. We deplore this, as was said in the first case "because it is not the policy of Federal Courts to 'intervene in the resolution of conflicts which arise in the daily operation of the school systems and which do not directly and sharply implicate basic constitutional values.'" *Quarterman v. Byrd, supra,* 453 F.2d at 56. Moreover, the Supreme Court itself has "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines School Dist., supra,* 393 U.S. at 507, 89 S.Ct. at 737. Nevertheless, we cannot remain silent when we truly believe that the regulations as presently written will raise more problems than they will solve. We have both compassion and understanding of the difficulties facing school administrators, but we cannot permit those conditions to suppress the First Amendment rights of individual students.

Nor will any intolerable burden result from our decision. Indeed, it may ameliorate the relationship between the student and the disciplinarian and lead them to empathize with each other. As Judge Kaufman remarked in *Eisner, supra* :

> The Board would in no way shackle school administrators if it attempted

---

5. We also note that to punish, ipsa dixit, a student who publishes literature which may have suffered improper prior restraint, places the student on his own peril and the resulting chill on First Amendment activity would be intolerable.

to confront and resolve in some fashion, prior to court intervention, some of the constitutional issues that will almost inevitably be raised when so broad a rule is applied to particular cases. [440 F.2d at 809].

It would be salutary for the Board to require the disciplinarian to afford the student or students involved in a non-school publication, for example, an opportunity to have a fair give-and-take confrontation with the administrator before the latter rules on the distribution of such student publications. At such an informal meeting, the whole problem might be aired; hard feelings dissipated; distrust overcome; and mutual confidence established. At the least the affected student would have a better opinion of the disciplinary process.

As an alternative to the present scheme, the matter might be turned over to a Student-Faculty Relations Committee of the sort envisioned in Rule 5130.-1(b),[6] and the disruption and bitterness generated by an unpopular refusal of the administrator to allow circulation of a student publication might thus be alleviated. Through such a joint effort, final answers may be found for the many difficult questions precipitated by prior restraint of student publications. For example, such a committee might decide: (1) where on school property it would be appropriate to distribute approved material; (2) the type of material that might cause distractions and disruptions among the students; and (3) the question of how serious a "disruption" must be before prior restraint would be justified. Such a course would lessen the possibility of arbitrary action and unfair treatment which, in turn, we think, would improve teacher-student relations.

The judgment of the trial court is reversed and appropriate action in implementation of this opinion, including injunctive relief where necessary, is directed to the end that the regulations adopted by the Board be in keeping with the requirements hereof.

It is so ordered.

BRYAN, Senior Circuit Judge (concurring):

I have had considerable difficulty with this case because of the problems logically arising in the conflict between the effectuation of the school authorities' bona fide aim and the restrictions of the First Amendment. In ordering four rewrites of the School Board's regulations, District Judge Northrop scrupulously endeavored to avoid a trespass upon student rights. I concur in the present opinion of the Court because it provides a clear and explicit chart by which the District Court and the Board may achieve their object and yet not trample upon the students' First Amendment privileges.

---

**6.** Rule 5130.1(b) provides:

In each secondary school, and in each elementary school for the students who have demonstrated the maturity needed to participate effectively, a Student-Faculty Relations Committee should be established consisting of an equal number of faculty and students chosen by their respective groups for the purpose of receiving recommendations and discussing concerns. The President of the Student Council shall be a member of this committee, with all other students in the school eligible for membership. The method of selection and number shall be determined by the Student Council of each school.