Miguel **HERNANDEZ** et al., Plaintiffs,

v.

Leonard **HANSON**, as Principal of South High School, and on behalf of all other principals similarly situated, et al., Defendants.

Civ. No. 75–0–174.

United States District Court,
D. Nebraska.

April 25, 1977.

Robert V. Broom and Gregory V. Johnson, Omaha, Neb., for plaintiffs.

David M. Pedersen, Omaha, Neb., for defendants.

DENNEY, District Judge.

This matter comes before the Court upon the cross-motions of the parties for summary judgment, declaring unconstitutional and in violation of the First and Fourteenth Amendments to the United States Constitution and enjoining the enforcement of policies and regulations of the School District of Omaha, Nebraska, which require students to obtain prior approval before distributing literature on behalf of non-school

sponsored organizations within the Omaha public schools. The case was brought pursuant to 42 U.S.C. § 1983. Jurisdiction is based upon 28 U.S.C. §§ 1343(3) and (4) and the power to grant declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.

Plaintiffs instituted this action on May 12, 1975, on their own behalf and as representatives of all students who are now or will be enrolled in the Omaha Public Schools and subject to the policies and regulations of the School District of Omaha and to the rules and regulations promulgated by individual school principals. The Court has previously certified the case as a class action pursuant to Fed.R.Civ.P. 23(a) and (b)(2) and has entered appropriate interlocutory relief.

■ Although affidavits have been submitted, the facts giving rise to the lawsuit are not relevant. Notwithstanding plaintiffs' challenge to the policies and regulations on their face and as applied, the Court is only concerned with the constitutional validity of the prior restraint regulations since plaintiffs are no longer students.[1]

### I.

■ Since the filing of this lawsuit, the School Board has, in good faith, promulgated new policies and regulations which are presently under challenge. This Court abhors the task of intervening in the conduct of matters within the province of local school authorities and will not interfere with the day to day operations of schools. However, when fundamental constitutional rights come into play, all creatures of the State, including the Boards of Education, must be subject to judicial scrutiny. *See West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Revised Policy 6.15, approved by the Board of Education on March 21, 1977, provides in relevant part as follows:

1. Although plaintiffs are no longer students in the Omaha Public Schools, the certification of

the case as a class action prevents any viable claim of mootness.

Students, staff members, or the facilities of the schools may not be used in any manner for advertising or promoting the interests of any community or non-school agency or organization without the approval of the Board of Education. Exceptions to the above rule are:

. . . . .

2. Any student seeking to distribute literature, fliers or announcements concerning non-school events or organizations to several other students must abide by the general guidelines established for this purpose contained in the *Practices and Procedures of the Omaha Public Schools,* copies of which are available from the building principal and/or the Office of the Superintendent of Schools.

. . . . .

Any appeal by a student from a determination of the Superintendent that the material the student submitted may not be distributed shall be heard and decided by the Board of Education within 5 school days of receipt by the Secretary of the Board of a written request for a hearing before the Board.

The Revised Practices and Procedures Concerning Flier Distribution in the Schools provide in relevant part as follows:

*Requests for Distributing Fliers on Behalf of Non-school Sponsored Organizations*—Requests received by the School District or by an individual building, from any student, agency or organization seeking permission to put up posters or distribute to several students literature, fliers or announcements to students concerning events, meetings or programs of non-school sponsored organizations, must follow the general guidelines listed below. Hopefully, the procedures outlined will assist in eliminating confusion, providing the activity greater opportunity for success. The school may cooperate in offering as many worthwhile opportunities to the students as are practical and consistent with the *Policies and Regulations of the School District of Omaha.*

1. The request, in writing should be submitted to the Office of the Superintendent of Schools, 3902 Davenport Street, Omaha, Nebraska 68131. Students may submit their written requests to the principal of their school who will forward those requests immediately to the Superintendent.

. . . . .

4. The person seeking permission to distribute fliers should provide as much advance notice as possible. The Office of the Superintendent will approve or reject the request within two school days of receipt of the request by the Superintendent, or, in the case of requests from students, within two school days of receipt by the building principal. Any request not acted upon within the time specified will be considered approved.

. . . . .

10. Only in the following circumstances will the distribution of fliers be prohibited:
a) When such distribution, whether because of the content of the flier or the manner of distribution, would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.
b) When the content of the flier is:
1) commercial in nature
2) sectarian
3) obscene; a flier is obscene for purposes of this prohibition if (i) the average person applying contemporary community standards would find that the flier, taken as a whole, appeals to the prurient interest of minors of the age to whom distribution is requested; (ii) the flier depicts or describes hard core sexual conduct in a manner that is patently offensive to prevailing standards in the adult community concerning how such conduct should be presented to minors of the age to whom distribution is requested; and (iii) the flier, taken as a whole, lacks serious literary, artistic, political, or sci-

entific value for minors of the age to whom distribution is requested.

4) libelous; a flier is libelous for purposes of this prohibition if it contains a false statement concerning another person which brings hatred, disgrace, ridicule or contempt on that person.

5) advocacy directed to inciting or producing imminent lawless action which advocacy is likely to incite or produce such action.

6) insulting or fighting words, the very utterance of which inflicts injury or tends to incite an immediate breach of the peace.

■ At the outset, it is important to note what this litigation does not involve. The plaintiffs do not challenge the constitutionality of the School Board's power to reasonably regulate the time, place and manner of distribution. "Just as in the community at large, reasonable regulations with respect to the time, the place, and the manner in which student groups conduct their speech-related activities must be respected." *Healy v. James,* 408 U.S. 169, 192–193, 92 S.Ct. 2338, 2352, 33 L.Ed.2d 266 (1972); *See, also Jones v. Board of Regents,* 436 F.2d 618, 620 (9th Cir. 1970). Nor do the regulations require prior approval of all written distributions by students. At issue is the constitutionality of regulations requiring prior approval of literature on behalf of non-school sponsored organizations intended to be distributed by students and a prohibition on commercial and secular literature. Plaintiffs vigorously contend that prior approval is unconstitutional per se as a prior restraint in violation of the First Amendment.

## II.

■ The importance of the issues presented in this sensitive area of the First Amendment cannot be denigrated. A public school is a market place of ideas and early involvement in debate and comment and free exchange is essential to the development of the democratic spirit necessary to the proper functioning of our govern-

ment. Policy 6.22 of the School District itself recognizes this philosophy:

a. Controversial issues arise from conflicts within the cherished interests, beliefs, or affiliations of large groups of our citizens. Such issues involve important proposals or policies upon which our citizens hold different points of view. The American heritage and our established traditions are not controversial. Most of the school curriculum is composed of established truths and accepted values. Free discussion of controversial issues is the heart of the democratic process. Freedom of speech and free access to information are among our most cherished traditions. Only through the study of such issues—political, economic, or social—does youth develop abilities needed for citizenship in our democracy.

Nevertheless, free speech is not absolute and "the extent of its application may properly take into consideration the age or maturity of those to whom it is addressed." *Quarterman v. Byrd,* 453 F.2d 54, 57 (4th Cir. 1971). As Justice Stewart emphasized in his concurring opinion in *Tinker v. Des Moines School District,* 393 U.S. 503, 515, 89 S.Ct. 733, 741, 21 L.Ed.2d 731 (1969), First Amendment rights of children are not "coextensive with those of adults."

The Court's analysis must begin with the historic *Tinker* case. The *Tinker* Court apparently recognized the right of school administrators to block the distribution of literature if they reasonably "forecast substantial disruption of or material interference with school activities." 393 U.S. at 514, 89 S.Ct. at 740. The majority of Courts which have followed in the aftermath of *Tinker* and considered the validity of regulations regarding prior approval of student literature have held that such prior restraints are not unreasonable so long as procedural safeguards are present. *Nitzberg v. Parks,* 525 F.2d 378 (4th Cir. 1975); *Baughman v. Freienmuth,* 478 F.2d 1345 (4th Cir. 1973); *Sullivan v. Houston Independent School District,* 475 F.2d 1071 (5th Cir. 1973); *Shanley v. Northeast Independent School District,* 462 F.2d 960 (5th Cir.

1972); *Quarterman v. Byrd, supra;* and *Eisner v. Stamford Board of Education,* 440 F.2d 803 (2nd Cir. 1971). *Contra, Fujishima v. Board of Education,* 460 F.2d 1355 (7th Cir. 1972).

Despite the majority approach, plaintiffs contend that under the standards of *Tinker,* school authorities may not limit or penalize the full exercise of protected speech absent a showing of "facts which might reasonably have led school authorities to forecast a substantial disruption of or material interference with school activities [or unless] disturbances or disorders on the school premises in fact occurred." *Tinker v. Des Moines School District,* 393 U.S. at 514, 89 S.Ct. at 740. Plaintiffs argue that the *Tinker* decision is devoid of any indication that the Supreme Court intended to sanction prior restraint as a means of "prediction" in the context of public schools and assert that the Court's reference to "facts" rather than "undifferentiated fear of apprehension of disturbance" as a basis for interference by school officials militates against the sanctions of a prior approval system. The Seventh Circuit accepted this argument in *Fujishima v. Board of Education, supra:*

> We believe that the court erred in *Eisner* [supra] in interpreting *Tinker* to allow prior restraint of publication—long a constitutionally prohibited power—as a tool of school officials in "forecasting" substantial disruption of school activities. In proper context, Mr. Justice Fortas' use of the word "forecast" in *Tinker* means a prediction by school officials that existing conduct, such as the wearing of arm bands—if allowed to continue—will probably interfere with school discipline. 393 U.S. at 514, 89 S.Ct. 733. *Tinker* in no way suggests that students may be required to announce their intentions of engaging in certain conduct beforehand so school authorities may decide whether to prohibit the conduct. Such a concept

of prior restraint is even more offensive when applied to the long-protected area of publication.

. . . . .

The *Tinker* forecast rule is properly a formula for determining when the requirements of school discipline justify *punishment* of students for exercise of their First-Amendment rights. It is not a basis for establishing a system of censorship and licensing designed to *prevent* the exercise of First-Amendment rights. 460 F.2d at 1358.

Plaintiffs' argument, and the Seventh Circuit's decision, are sufficiently undermined with little difficulty. The prior approval rule apparently sanctioned by *Eisner* and its progeny does not emanate from *Tinker* but rather from previous Supreme Court precedent. In *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 502, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952), the Supreme Court held that motion pictures are included "within the free speech and free press guaranty of the First and Fourteenth Amendments" but recognized that "capacity for evil . . . may be relevant in determining the permissible scope of community control." Subsequently, in *Times Film Corp. v. City of Chicago,* 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), the Court considered and upheld a requirement of submission of motion pictures in advance of exhibition, and in *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the Court focused on the procedural safeguards that must be present in a system of censorship. It is upon these cases that the prior approval rule of *Eisner* and its progeny emanate.

█ Plaintiffs' contention that a sanction of a prior approval system in this case will open the door for similar infringements on free speech is simply misplaced. As the courts have previously noted, the rights of students are not coextensive with adults.[2]

---

2. *See* Haskell, Student Expression in the Public Schools; Tinker Distinguished, 59 *The Georgetown L. Journal* 37, 57–58 (1970):

> It seems reasonable that the constitutional limits on student expression in the schoolhouse may be different from those in the community at large, because there are differ-

The Court therefore holds that, given the nature and purpose of the public school, there is nothing per se unreasonable in requiring prior approval of written distributions so long as procedural safeguards are afforded.

 However, this Court's sanction of a prior submission rule does not end the Court's inquiry. "Any system of prior restraint of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 689, 9 L.Ed.2d 584 (1963). The defendants, therefore, carry a heavy burden of showing a justification for the imposition of such a restraint. *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). The practice at issue requires prior approval "to distribute to several students literature, fliers or announcements . . . concerning events, meetings or programs of non-school sponsored organizations . . ." A prior approval rule as a means to forecast disruption and to control the time, manner and place of a *substantial* distribution is valid. However, in this case, the Board has overextended its reach in requiring the prior approval of non-school literature intended to be distributed to several students in that the likelihood of disruption of school activities is insignificant in such minor distributions. *Cf. Shanley v. Northeast Ind. School District,* 462 F.2d at 977. The Second Circuit in *Eisner v. Stamford Board of Education, supra,* noted as follows:

We assume, therefore, that the Board contemplates that it will require prior submission only when there is to be a *substantial* distribution of written material, so that it can reasonably be anticipated that in a significant number of instances there would be a likelihood that the distribution would disrupt school operations. If the Board chooses to redraft its policy in light of what we have said in this opinion, it must make its intentions

in this respect clear. Once it does, courts may better evaluate the potential "chill" of the policy on speech. The Board would be wise to be mindful of this danger zone. 440 F.2d at 811.

Defendants' attempt to defend the rule on the basis that it involves non-school activities is unsubstantiated. Dr. Joe E. Hanna, Associate Superintendent of Schools for the School District of Omaha, testified by affidavit as follows:

9. Prior screening of such advertisements is necessary for the following reasons:

The distribution or content of fliers which deal with activities or programs sponsored by non-school organizations have the potential of being substantially and materially disruptive of appropriate discipline in the operation of the schools of the School District of Omaha. Since the school system and the principal, in particular, are responsible for student discipline during the school day, whatever transpires in the building should be under the direct or indirect control of school authorities. If school authorities are prohibited from operating on a preventive rather than a remedial basis, then it becomes difficult, if not impossible, to avoid substantial disruption of the educational process. A tense situation can arise in a building at any time. It is imperative that the school authorities be free to judge the circumstances and determine the impact any such distribution could have on their efforts to maintain order. Most students in the schools of the School District of Omaha are present in the schools under Nebraska's Compulsory Attendance Laws. This makes them a "captive audience" for any distribution of advertising within the schools. This circumstance has the potential for substantial abuse unless some prior screening is permitted. The primary purpose of our schools is the education of the students.

ent elements in balancing the private and public interests involved, . . . Rigid constitutional constraints imposed by a judiciary untrained in the problems of operating

public schools would have the effect of precluding the exercise of prudent judgment by those knowledgeable and trained in public school administration.

The educational process could be materially damaged by exploitation of students through the distribution of advertisements of whatever sort concerning non-school sponsored events or organizations. Defendants have clearly failed to meet their burden of justifying the prior approval system for intended distribution to "several students."

### III.

Plaintiffs attack the outright prohibition of distribution of literature commercial in nature or sectarian. Dr. Hanna testified by affidavit as follows:

This prohibition rests upon the judgment that permitting distribution of such advertising would substantially and materially contribute to the erosion of the educational process by distracting student attention and time away from the major purpose of the student's presence at school: to obtain an education. Moreover, most of the students in the schools of the School District of Omaha are present in the schools because of Nebraska's Compulsory Attendance Law. These students are a "captive audience." If sectarian or commercial fliers were permitted to be distributed to students, the schools would undoubtedly be flooded with handouts.

### ▮ A. *Commercial Literature*

The Seventh Circuit held in *Jacobs v. Board of School Commissioners,* 490 F.2d 601, 608 (7th Cir. 1973) as follows:

We have little question of the legitimacy of the interest of the school authorities in limiting or prohibiting commercial activity on school premises by persons not connected with the school, either acting directly or through students. But because students have first amendment rights within the school, as recognized in *Tinker,* we think that the propriety of regulation of their conduct involving the

exercise of protected rights must be independently justified.

The court concluded that the prohibition was invalid because "there are periods in the morning, around noon, and in the late afternoon when . . . substantial numbers of students are on the premises, are not involved in classroom activity, and are barred by proviso 1.3.1.1 . . ." *Id.* at 609.

The Supreme Court has recently held that there is not a First Amendment exception for "commercial speech." *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). *Tinker* allows a prior restraint only when the school officials can reasonably "forecast substantial disruption of or material interference with school activities." 393 U.S. at 514, 89 S.Ct. at 740. The question is therefore whether the School Board can reasonably forecast that the distribution of commercial literature or sectarian literature anywhere within a school at any time would substantially disrupt or materially interfere with school activities. Given the power of the school to reasonably regulate the time, manner and place of expressive activities and that regulations "must be narrowly tailored to further the State's legitimate interest," *Grayned v. City of Rockford,* 408 U.S. 104, 115–117, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972), the Court concludes as a matter of law that the outright prohibition of commercial literature is inconsistent with the First Amendment.[3]

### B. *Sectarian Literature*

▮ It cannot be doubted that leaflets advertising religious activities are protected by the constitutional guaranty of free speech and press to the same extent as "ordinary" speech. *Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). However, defendants attempt to justify their position

---

**3.** Defendants' reliance upon *Katz v. McAuley,* 438 F.2d 1058, 1061 (2nd Cir. 1971), is misplaced. Although the Second Circuit upheld a ban on solicitation of funds from pupils by

non-students "[i]t is not enough to say that such activity by students is similar to commercial activity by others." *Jacobs v. Board of School Commissioners,* 490 F.2d at 608.

of official "neutrality" as consistent with the well-established principle of the separation of Church and State.

The Court is not aware of any decision wherein this specific issue was considered and determined. In *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the Supreme Court held unconstitutional as violative of the First Amendment's establishment clause a state statute requiring religious exercises in public schools, consisting of reading from the Bible and recitation of the Lord's Prayer. Moreover, several courts have held unconstitutional the distribution of Bibles to public school children. *See, e. g., Meltzer v. Board of Public Instruction of Orange City,* 548 F.2d 559 (5th Cir. 1977); *Goodwin v. Cross County School District,* 394 F.Supp. 417 (E.D.Ark.1973); *Brown v. Orange County Board of Public Instruction,* 128 So.2d 181 (Fla.App.1960); *Tudor v. Board of Education,* 14 N.J. 31, 100 A.2d 857 (N.J.1953), *cert. denied,* 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 644 (1954).

 The Supreme Court has developed a three-prong test for determining whether a state statute or regulation violates the Establishment Clause. The statute or regulation must have a secular legislative purpose; it must have a "primary effect" that neither advances nor inhibits religion; and its administration must avoid excessive entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). In the view of this Court, to permit distribution of religious literature in the public schools is more than merely to accommodate religion. If students were permitted to distribute religious literature, "[i]n the eyes of the pupils and their parents the board of education [would have] placed its stamp of approval upon [the] distribution, and, in fact, upon the [religious literature] itself." *Tudor v. Board of Education,* 100 A.2d at 868.

Separation means separation, not something less. . . . In no activity of the state is it more vital to keep out divisive forces than in its schools, to avoid confusing, not to say fusing, what the Constitution sought to keep strictly apart." *People of State of Illinois ex rel McCollum v. Board of Education,* 333 U.S. 203, 231, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948).

*cf. Hunt v. Board of Education of County of Kanawha,* 321 F.Supp. 1263 (S.D.W.Va. 1971). As the Second Circuit appropriately noted in *Stein v. Oshinsky,* 348 F.2d 999, 1002 (2nd Cir. 1965): "After all the States have been told about keeping the 'wall between church and state . . . high and impregnable," *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947), it would be rather bitter irony to chastise [defendants] for having built the wall too tall and too strong."

## IV.

 Finally, plaintiffs attack the revised policy as vague. Despite plaintiffs' assertion to the contrary, the exacting standard of a criminal statute is not required in formulating school regulations. *Quarterman v. Byrd,* 453 F.2d 54, 60; *Esteban v. Central Missouri State College,* 415 F.2d 1077, 1089–1090, (8th Cir.), *cert. denied* 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1969). However, if the School Board undertakes to rewrite their policy, "[r]efinement . . . would lessen the possibility that the policy statement under attack here . . . will be administered arbitrarily, erratically or unfairly . . .", *Eisner v. Stamford Board of Education,* 440 F.2d 809, and might reduce the likelihood of future litigation.[4] The Court has compassion and understanding of the problems facing school officials and strongly believes it is in the interests of all concerned if the everyday affairs in the operations of public

---

4. The Court notes that the two day review period may, in certain situations, be an unconstitutionally impermissible length of time. Although defendants argue that the policy does not cover distribution of student newspapers, it is not at all clear why "literature . . .

concerning non-school events" would not encompass student newspapers and newsletters. In the important arena of news events where stale publication loses its value, the Board must be careful not to effectively deprive students of the right to discuss newsworthy current events.

schools can be left in the hands of school officials.

The Court concludes that the policy and practice is overbroad because: (1) it establishes a prior restraint on distribution without a requirement that the distribution interfere in a material and substantial way with the administration of school activity and discipline; and (2) because it prohibits any distribution of literature concerning non-school events or organizations commercial in nature.

Accordingly, judgment shall be entered declaring Revised Policy 6.15 and The Revised Practices and Procedures Concerning Flier Distribution in the Schools invalid and unconstitutional and enjoining its enforcement.[5]

**5.** Plaintiffs request the Court to order defendants to promulgate constitutional rules and regulations and to retain jurisdiction over the parties. The School Board is not compelled under the law to promulgate rules concerning distribution of literature. *See* Neb.Rev.Stat. § 79–4175 (1976). The Court is confident that, in the event defendants undertake to rewrite their policies, they will do so in good faith and in conformity with the mandate of this Court.