MARYLAND PUBLIC INTEREST
RESEARCH GROUP

v.

Wilson H. ELKINS, Individually and as
President of the University of
Maryland, et al.

Civ. No. K–75–1751.

United States District Court,
D. Maryland.

Dec. 30, 1976.

Girardeau A. Spann, Washington, D. C., Gary Howard Simpson, Bethesda, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Maryland, David H. Feldman, Mary Elizabeth Kurz, Jack T. Roach, Asst. Attys. Gen. of Maryland, Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

Maryland Public Interest Research Group (MaryPIRG) seeks declaratory and injunctive relief against the President and Board of Regents of the University of Maryland, each of the members of the Board of Regents, and the Chancellor of the College Park Campus of said University. All defendants other than the Board itself are named as defendants in their individual as well as their official capacities. Jurisdiction exists in this case pursuant to 28 U.S.C. § 1343, the jurisdictional counterpart of 42 U.S.C. § 1983,[1] except perhaps as to the defendant Board of Regents. The latter may not be a "person" within the meaning of section 1983. *See Sheppard v. West Va. Bd. of Regents*, 378 F.Supp. 4, 6 (S.D.W.Va. 1974), *aff'd*, 516 F.2d 826 (4th Cir. 1975). In that case, however, Judge Thomsen of this Court, sitting by designation on the Fourth Circuit, declined to decide the question of whether section 1983 relief could be granted against the Board "because the members of the Board were sued individually". *Id.* at 829. The same situation exists herein. Accordingly, no relief is needed against the Board as an entity in this case and none will be granted.[2]

Plaintiff alleges that defendants are abridging plaintiff's first amendment rights of free expression and association and also its first amendment rights to petition the Government for redress of grievances, by placing upon the use by plaintiff of funds appropriated for plaintiff by the Board of Regents, the condition that plaintiff not use any part of those funds to pay litigation expenses. Plaintiff also contends that defendants' actions violate plaintiff's fourteenth amendment rights to due process and equal protection. Plaintiff MaryPIRG

---

1. Jurisdiction is also alleged under 28 U.S.C. § 1331. However, there is a factual issue as to whether the jurisdictional amount is met. The appropriation requested by MaryPIRG from the SGA for all of MaryPIRG's special projects, including litigation expenses, was $1760. The amount approved for those projects, in both fiscal years involved herein, by the SGA and the Board of Regents was for less than $10,000 even if the salary of MaryPIRG's Executive Director, an attorney, is deemed legal expense and part of the alleged amount at stake in this case. It is also to be noted that possible future appropriations probably may not be added for purposes of 1331's $10,000 requirement because there is no certainty plaintiff will receive any future allocations, since, subject to its constitutional and lawful exercise thereof, the Board of Regents has the on-going discretionary authority and duty to make appropriations for student activities on a year-by-year basis. *See generally* Md.Ann.Code art. 77A, § 15, *as amended* (Cum.Supp.1975). In any event, in this case, those 1331 jurisdictional issues need not be resolved since other subject matter jurisdiction independently exists. That jurisdictional base is 28 U.S.C. § 1343(3), the jurisdictional counterpart of 42 U.S.C. § 1983, in view of plaintiff's allegations that defendants, acting under color of state law, have deprived plaintiff of rights and liberties secured by the Constitution and laws of the United States.

2. Seemingly, there is a difference among the circuits with regard to the question left unanswered by Judge Thomsen in *Sheppard* and herein. *Compare Blanton v. State Univ. of N.Y.*, 489 F.2d 377 (2d Cir. 1973) (Friendly, J.) (state university not a "person") *and Whitner v. Davis*, 410 F.2d 24, 29–30 (9th Cir. 1969) (state college not a "person"), *with Lee v. Board of Regents of State College*, 441 F.2d 1257 (7th Cir. 1971) (board of regents is a "person") *and Stebbins v. Weaver*, 396 F.Supp. 104, 108 (W.D.Wis.1975) (board of regents is a "person"). The question is not addressed by the Supreme Court or the Seventh Circuit in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), *reversing on other grounds* 446 F.2d 806 (7th Cir. 1971), *aff'g* 310 F.Supp. 972 (W.D.Wis. 1970). The district court in *Roth* had specifically held that the board of regents was a "person" within 1983. 310 F.Supp. *supra* at 974.

is a student organization whose stated purpose is to advocate the public interest in areas of concern to students enrolled on the College Park Campus. On February 12, 1974, the Student Government Association (SGA) approved MaryPIRG's constitution, thus making plaintiff an approved organization and as such an entity eligible to request and to receive appropriations out of the Student Activities Fund which is administered by SGA. The latter, after receiving requests for allocations from the fund by organizations approved by it, prepares a budget for the fund. The budget is then submitted by SGA to the Board of Regents for modification and/or approval. Following MaryPIRG's request to SGA for $37,997 for fiscal year 1974–75, SGA included an allocation for MaryPIRG in SGA's 1974–75 budget submitted to the Board of Regents, but in the reduced amount of $25,437. When the Board of Regents, at its meeting on September 20, 1974, considered SGA's 1974–75 proposed budget, the President, defendant Elkins, stated his understanding that the Attorney General of Maryland had ruled that no one could employ counsel to represent students out of University funds except as authorized by the Attorney General. As a result, the

Board of Regents approved the allocation for MaryPIRG, subject to the condition that plaintiff not use any of the funds so appropriated to pay litigation expenses. On December 4, 1975, the Board of Regents approved an appropriation of $38,619 for MaryPIRG for 1975–76, but again subjected that appropriation to the above-stated restriction. On August 27, 1976, the Board approved another appropriation subject to the same restriction.

MaryPIRG, contending that that restriction has rendered it unable to resort to litigation in several instances in which it would have been advantageous for it so to do,[3] seeks (a) a declaratory judgment that the no-litigation restriction is unconstitutional under the first and fourteenth amendments of the United States Constitution and (b) an injunction restraining defendants from continuing in force and effect that restriction.

Defendants have moved to dismiss or in the alternative for summary judgment on several grounds. Plaintiff, in turn, has moved for summary judgment on the basis of its first amendment contentions. Plaintiff admits that its fourteenth amendment due process and equal protection claims[4]

---

**3.** In his affidavit Robert Lederer, former chairperson of MaryPIRG, states that plaintiff has a frequent need to litigate to obtain documents under the Maryland Public Information Act and the Federal Freedom of Information Act, which documents are relevant to investigations engaged in by MaryPIRG. In addition, Lederer states that MaryPIRG would have engaged in substantial litigation on several occasions but for the restriction. While there is no explicit statement by Lederer in his said affidavit that it is made by him on the basis of personal knowledge, implicit in the first and last paragraphs thereof are such assertions. Nor do defendants by any Rule 56 submissions controvert the assertions made in those two paragraphs. MaryPIRG's past record of participation in litigation, e. g., Public Citizen, et al. v. Commission on Medical Discipline, Civil No. 74–56–B (D.Md. opinion filed June 24, 1976) (three-judge court before which MaryPIRG was one of the plaintiffs), and its present prosecution of this case, funded by means independent of the SGA allocation, show that there is no genuine factual dispute with regard to MaryPIRG's present and on-going desire and intention to engage in litigation.

**4.** In an affidavit Robert Lederer states as follows:

* * * In conducting its fall survey of area banks, MaryPIRG noticed that the Chevy Chase Bank and Trust Co., which offered free checking services, had in June, 1973 entered the lowest bid for establishment of a branch bank on the College Park campus. A campus branch bank offering free checking would save the university students and personnel up to $300,000 per year, would provide income for the University through rent payments, and would relieve the University of the burden of operating a check cashing service. Because of these benefits the University community favored the opening of a campus branch bank. Although the Chevy Chase branch application had at that time been pending for a year and a half before the State Bank Commissioner, the application had never been acted on, even though such applications are generally approved within a few months. In February 1975, MaryPIRG urged the Commissioner to expedite approval of the application, but one month later the application was denied without any stated reason. MaryPIRG's investigation, however, revealed that the University had de-

are not presently ripe for summary judgment, but correctly points out that those issues need not be reached herein if plaintiff is successful in its quest for relief in connection with its first amendment grounds. Since this Court concludes herein that plaintiff is entitled to relief on first amendment grounds, the due process and equal protection questions are not further discussed in this opinion except to note that the requirements of due process in the context of appropriations, for organizations approved by SGA, by the Board of Regents were the subject of earlier litigation in this Court. *Bovello v. Kaplan*, No. 71–1306–M (D.Md. filed August 30, 1972), *vacated as moot*, No. 72–2305 (4th Cir. filed April 16, 1973).[5]

### Mootness and Ripeness

■ Defendants contend that this case is both moot and not ripe. As to mootness, defendants point to an editorial in the January 19, 1976 issue of the *Diamondback*, the College Park student newspaper which contained the statement that MaryPIRG "has declared its desire to further disassociate itself from SGA by not taking money from it." In affidavits made on February 26, 1976, subsequent to the appearance of the *Diamondback* article, Paul Muntjan and Robert Lederer, both members and former chairpersons of MaryPIRG's Board of Directors, have stated that virtually all of MaryPIRG's funds come from SGA appropriations.[6] Those affidavits have not been controverted by defendants. Moreover, the parties have stipulated that on August 27, 1976, the Board of Regents approved the SGA recommended allocation of student activities fees to MaryPIRG for 1976–77. Thus, this case is not moot.

■ As to ripeness defendants argue that plaintiff's desire to litigate lacks specificity, is speculative and, in any event, in the context of the amount of the appropriations to date for litigation, involves no foreseeable litigation by plaintiff of any substantial nature. Defendants point out that SGA itself reduced plaintiff's litigation requests without objection by plaintiff. However, the record establishes that if the restriction of which plaintiff complains was not in existence, plaintiff would in fact engage in additional litigation. Accordingly, the defendants' ripeness argument is without merit. Thus, the merits of plaintiff's first amendment claims must be reached herein.

posits of about $100 million in another bank that would suffer competitive injury from the opening of a Chevy Chase branch on the College Park campus. Moreover, MaryPIRG discovered that the President of the University of Maryland was a director of the competing bank, thereby creating a potential conflict of interest. MaryPIRG successfully urged state legislators to investigate the matter and a joint committee of the Maryland General Assembly then held hearings. At the time those hearings were held in June, 1975 it was also revealed that on three separate occasions, the Chairman of the Board of Regents had threatened to cut off MaryPIRG's funding if it persisted in the bank investigation. MaryPIRG did persist, however, and on July 30, 1975, after MaryPIRG testified before the State Board of Ethics concerning the potential conflict of interest, the President of the University resigned from the board of directors of the competing bank. In addition, after a renewed application was approved by the Bank Commissioner in September, 1975, the campus branch bank opened in December 1975.

\* \* \* The animosity that the bank project caused on the part of the Regents was increased when MaryPIRG participated with SGA and Common Cause in a study of the University athletic department which concluded that the University was unlawfully discriminating on the basis of sex in violation of Title IX of the Federal Education Act of 1972. The study, which found gross disparities between the athletic treatment and facilities available for men and those available for women, made specific recommendations for improvement designed to bring the University into compliance with Title IX. It is too soon to determine whether that study, which was released on November 21, 1975, will result in needed remedial action, but the study has further strained the relationship between MaryPIRG and the Regents.

These allegations of retaliatory purpose are part and parcel of plaintiff's fourteenth amendment claims. Defendants deny those allegations, thus making summary judgment inappropriate as to those claims.

5. Copies of those opinions have been made a part of the official court file in this case.

6. Lederer Affidavit, paragraph 9; Muntjan Affidavit, paragraph 2.

*Merits*

■ To prevail herein on the basis of its first amendment claims, plaintiff must establish that the activity which plaintiff desires to engage in and would engage in but for the alleged unlawful infringement by defendants is an activity protected by the first amendment, and that defendants are in fact restricting such protected activity. If plaintiff so establishes, then the State must in turn establish that its actions advance a substantial governmental purpose unrelated to suppression of plaintiff's first amendment rights, and also that those actions embody no greater infringement upon plaintiff's protected interests than is necessary to advance the legitimate governmental interests involved.

*United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1643, 20 L.Ed.2d 672 (1968), is a criminal case involving the burning of a draft card in which the defendant's conviction was upheld. In the course of weighing and balancing the important governmental interest in having available sufficient potential members of the military and in otherwise administering its draft laws against the claimed first amendment right of the defendant to express symbolically his antiwar beliefs by destruction of his draft card, Mr. Chief Justice Warren opted for the former. In so doing, he wrote (at 376–77, 88 S.Ct. at 1679) that even assuming

> that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, * * * a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental inter-

est; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. * * * [Footnotes omitted.]

First Amendment issues in a university or school context have been presented to the Supreme Court in a number of cases, including *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); and *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). *Shelton* held that an Alabama statute requiring public school teachers annually to file affidavits giving names and addresses of all organizations to which they had belonged or contributed within the preceding five years was unconstitutional as applied to untenured teachers. Noting (at 485, 81 S.Ct. at 250) the importance and "the relevance of a State's inquiry into the fitness and competence of its teachers", Mr. Justice Stewart in a 5–4 decision also wrote (at 485–86, 81 S.Ct. at 251) that "to compel a teacher to disclose his every associational tie is to impair that teacher's right of free association, a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." The Justice also observed (at 487, 81 S.Ct. at 251) that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools" and noted (at 488, 81 S.Ct. at 252): "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose" (Footnotes omitted). Dissenting, Mr. Justice Frankfurter concluded (at 496, 81 S.Ct. at 256) that the "restriction" imposed upon the "liberty" of the teachers "or upon that of the community"

was not such "as to overbalance the State's interest * * *." Dissenting also, Mr. Justice Harlan wrote (at 497–98, 81 S.Ct. at 257):

> The rights of free speech and association embodied in the "liberty" assured against state action by the Fourteenth Amendment * * * are not absolute. * * Where official action is claimed to invade these rights, the controlling inquiry is whether such action is justifiable on the basis of a superior governmental interest to which such individual rights must yield. When the action complained of pertains to the realm of investigation, our inquiry has a double aspect: first, whether the investigation relates to a legitimate governmental purpose; second, whether, judged in the light of that purpose, the questioned action has substantial relevance thereto. * * *

> In the two cases at hand, I think both factors are satisfied. * * *

In *Tinker v. Des Moines Community School Dist., supra,* with Mr. Justice Black and Mr. Justice Harlan dissenting, Mr. Justice Fortas held that the wearing of black armbands by students on school facilities in violation of a school regulation, for the purpose of expressing views against the Vietnamese war, was "the type of symbolic act that is within the Free Speech Clause of the First Amendment" (at 505, 89 S.Ct. at 736) and was not on balance sufficiently disruptive of state interests so as to outweigh the first amendment rights of the students. In so holding, the Justice wrote (at 506, 89 S.Ct. at 736):

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years. * * *

The majority opinion in *Tinker* also contains this teaching (at 509, 89 S.Ct. at 738):

Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. *Burnside v. Byars,* * * * [363 F.2d 744, 749 (5th Cir. 1966)].

Mr. Justice Powell, in *Healy v. James, supra,* noted (408 U.S. at 171, 92 S.Ct. at 2341) at the outset of his opinion that the "interest of students, faculty members, and administrators in an environment free from disruptive interference with the educational process" and "the equally significant interest in the widest latitude for free expression and debate consonant with the maintenance of order" sometimes "compete" and must be balanced. In *Healy,* the application of plaintiffs requesting official status, as a campus organization, for their local chapter of Students for a Democratic Society had been denied by a state college after evidentiary hearings. After observing (at 180, 92 S.Ct. at 2345) that "state colleges and universities are not enclaves immune from the sweep of the First Amendment" and citing and quoting from *Tinker* and *Shelton* in support of that conclusion, Mr. Justice Powell, in the course of remanding for further factual developments and findings, wrote (at 184, 92 S.Ct. at 2347) that "once petitioners had filed an application in conformity with the requirements [of the College], the burden was upon the College administration to justify its decision of rejection. * * * It is to be remembered that the effect of the College's denial of recognition was a form of prior restraint * * *. While a college has a legitimate interest in preventing disruption on the campus * * *, a *'heavy* burden' rests on the college to demonstrate the appropriateness of that action." (Emphasis added.)

■ Defendants, in effect, seem to urge not only that their judgmental balancing of interests should be given great weight but that it should almost be deemed controlling by this Court. If that is defendants' position, this Court cannot accept it. If plaintiff's constitutional rights are being infring-

ed, it is this Court, not the state agency, which must make the ultimate balancing determination. Thus, in a case involving a most sensitive situation—regulations of the National Park Service concerning public gatherings on the White House sidewalk on Pennsylvania Avenue and in Lafayette Park—Judge Leventhal wrote that "this case is not a normal review of an executive action or administrative proceeding. When the executive or the administrative process abridges constitutional rights, it is subject to closer scrutiny than otherwise, and ultimately it is the court rather than the agency that must balance the competing interests." *A Quaker Action Group v. Morton*, 170 U.S.App.D.C. 124, 516 F.2d 717, 723 (1975). Of course, in so doing, the court should always give great weight to the views and determinations of those charged by the state with the performance of administrative duties and the exercise of discretion in accordance therewith. But the court, in the end, must balance the competing interests and determine which outweighs the other.

■ The right of access to the courts is a freedom protected by the first amendment against abridgement by the Federal Government, and, through the due process clause of the fourteenth amendment, by state governments as well. *See California Motor Transit Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). *See also Carter v. Lally*, F.Supp. (D.Md., Civil No. 72–642–K, December 27, 1976) and cases cited therein. Defendants do not contest that conclusion. However, defendants contend herein that they have not violated any such right of plaintiff. Rather they argue that they have placed no affirmative restriction on plaintiff's right to litigate. Rather, say defendants, they have merely refused to allow MaryPIRG to use certain state funds to finance certain of MaryPIRG activities, and that such refusal is not a prohibited impairment of plaintiff's first amendment rights.

Defendants cite in support of their arguments *Winston-Salem/Forsyth County Unit of North Carolina Ass'n of Educ. v. Phillips*, 381 F.Supp. 644 (M.D.N.C.1974); *National Strike Information Center v. Brandeis University*, 315 F.Supp. 928 (D.Mass.1970); *Lawrence Gay Liberation Front v. University of Kansas*, Civil No. T–5069 (D.Kan. February 10, 1972), aff'd, Civil No. 72–1159 (10th Cir. March 12, 1973).[7] The *Winston-Salem* case involved a North Carolina statutory prohibition against contracts between state governmental units and public employee labor organizations. In the *Brandeis* case, Judge Caffrey dealt with the question of whether the defendant University was required to subsidize certain activities and to make certain facilities available to plaintiff, and held in the negative. In the *Kansas* case, injunctive relief was unsuccessfully sought to enjoin the denial of recognition as a campus organization to a "gay front" group. As to the validity in this Court of that holding in the *Kansas* case, *see Gay Alliance, etc. v. Matthews, et al.*, 544 F.2d 162 (4th Cir. 1976). None of the three cases involved the placing of a condition or a restriction on the use of funds or of anything else. That is the context in which the within case arises. With regard to that type of issue, writing in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), for a unanimous Supreme Court, Mr. Justice Stewart observed (at 597, 92 S.Ct. at 2697):

For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit, and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his

---

7. A copy of the opinions of the Circuit and District Courts in that last-cited case are in the court file in this case.

exercise of those freedoms would in effect be penalized and inhibited * * *. Such interference with constitutional rights is impermissible.

While MaryPIRG's appropriation has not been terminated outright, as was Sindermann's employment contract, because of the latter's exercise of first amendment rights, implicit if not explicit in the restriction prohibiting MaryPIRG's use of funds for litigation is the University's position that MaryPIRG's funding will be cut off if MaryPIRG engages in litigation. If, as this Court concludes and defendants appear not to controvert, MaryPIRG has a constitutional right to engage in litigation, then defendants, through the litigation restriction, have infringed upon activity of plaintiff protected by the first amendment. That infringement requires justification by defendants.

The minutes of the Board of Regents' September 20, 1974 meeting includes the following:

> Regent Tydings moved that the Board of Regents approve the allocation by the Student Government Association of the College Park campus of $25,437 to the campus chapter of MaryPIRG, the funds to be disbursed in conformity with all applicable rules and regulations of the University.
>
> Regent Connelly asked about legal counsel that could be provided.
>
> President Elkins said the Attorney General has ruled that nobody can employ counsel out of University funds, except by permission of the Attorney General's Office. He said that we may employ people who have equal knowledge and a degree to offer advice and counsel. However, they cannot represent the students. Regent Connelly remarked that that means that members of the Bar may be employed to review documents, give advice, but not represent the students.
>
> Mr. Case said that the point is well taken. He said he did not think that it was clear that this appropriation was to be subject to the laws of the state and subject to the

opinions of the Attorney General. He said: "Just so everybody knows where we stand and there is no doubt about it, I suggest that in the last full line of the resolution after the word 'with' you insert 'the laws of this state, the opinions of the Attorney General and.' In that way, with those words, there can't be any question about it."

The Board of Regents approved the amendment to the motion and then passed the amended motion.

The minutes of the Board's meeting on December 4, 1975 contain the following entry:

> The fourth condition is that the Board of Regents reaffirms its position of September 20, 1974, that funds drawn by a student organization from S.G.A. allocations shall be disbursed in conformity with the laws of this state, the opinions of the Attorney General and all applicable rules and regulations of the University and shall not be used for litigation.

It is arguable that the governmental interest involved in the restrictive condition adopted by the Regents was simply a desire to insure conformance with and obedience to state law. That desire would require examination by this Court into the interest underlying the state law in question, were it not that defendants have in no way and at no time shown that there is such a state law. Plaintiff alleges that the real motivation for the restriction simply was and is a desire of defendants to prevent MaryPIRG from engaging in activities similar to its prior actions—actions which MaryPIRG claims have caused embarrassment to Defendant Elkins and to certain members of the Board of Regents.[8] Even if that contention is assumed totally false, defendants have not demonstrated any substantial valid interest in the restriction. During a hearing on the record in this Court on May 6, 1976, defendants suggested that they might present a justification for the restriction based upon educational purpose. However, other than that conclusory assertion,

---

8.  *See* n.4 *supra.*

no such presentation has been forthcoming from defendants. Defendants have, however, filed an affidavit of Janet A. Manger that the University's Regents have never approved an allocation of student activities fees to any student organization for use for litigation purposes. Plaintiff has not controverted that assertion. In any event, in the context of plaintiff's summary judgment motion, that fact is deemed established. However, it hardly adds up to anything other than an unsupported assertion of a valid governmental need to impose and maintain the restriction of which Mary-PIRG complains. Accordingly, plaintiff is entitled to the grant of its motion for summary judgment on first amendment grounds.

### Relief

In *Nitzberg v. Parks*, 525 F.2d 378, 384–85 (4th Cir. 1975), a case involving public secondary school regulation of student publications at a Baltimore County senior high school, Mr. Justice Clark, sitting by designation, aptly described the dilemma in which a federal court finds itself in a case such as this:

> This is the third time that this circuit has been confronted with the free speech aspects of secondary public school regulations and found it necessary to intervene in the conduct of such matters by the local school authorities. We deplore this, as was said in the first case "because it is not the policy of Federal Courts to 'intervene in the resolution of conflicts which arise in the daily operation of the school systems and which do not directly and sharply implicate basic constitutional values.'" *Quarterman v. Byrd*, * * * 453 F.2d 54, 56 (4th Cir. 1971). Moreover, the Supreme Court itself has "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines School Dist., supra*, 393 U.S. at 507, 89 S.Ct. [733] at 737. Nevertheless, we cannot remain silent when we truly believe that the regulations as presently written will raise more problems than they will solve. We have both compassion and understanding of the difficulties facing school administrators, but we cannot permit those conditions to suppress the First Amendment rights of individual students.

In *Nitzberg*, the school regulations were changed four times after litigation commenced. In the within case, in an attempt to fashion a decree which will permanently resolve the conflict between the parties, this Court, after informing counsel for both sides that it would enter judgment in favor of plaintiff MaryPIRG, requested the parties, without prejudice to any appeal from that judgment, to explore the possibility of a joint proposal for new standards governing MaryPIRG's litigation activities. In so doing, this Court sought to avoid extended litigation similar to that in *Nitzberg* and other cases which might result should this Court simply strike down the existing restriction of which MaryPIRG complains and leave formulation of different standards in the first instance to defendants. However, although counsel for the parties did meet to discuss that possibility, their efforts bore no fruit. Defendants subsequently notified this Court of their intention to appeal from any judgment of this Court holding the restriction in question in this case unconstitutional, that they did not desire to indicate any agreement, on a secondary basis or otherwise, in connection with any removal or alteration of that restriction, and that in defendants' view, if this Court was going to hold that restriction unconstitutional, it should refrain at this time from formulating any decree setting forth specific relief.

Plaintiff, asserting its belief that it has a present right to unfettered use of the appropriated funds and complaining that this Court should not "lead defendants by the hand" to a valid restriction, seek a decree unconditionally voiding the existing restriction and enjoining defendants from promulgating any new restriction without giving plaintiff the advance opportunity to contest the legality of such new restriction in a court proceeding. This Court declines to

follow either party's desires in those connections. This Court believes that it is preferable for it to balance the conflicting interests discussed by Mr. Justice Clark in *Nitzberg* and to do its best to avoid continuing litigation in connection therewith. Accordingly, the following Decree is today being entered. However, the Decree shall not become effective (a) unless defendants do not timely note an appeal from the judgment herein to the Fourth Circuit or (b) if such an appeal is noted, until the Fourth Circuit has entered its judgment in this case.

### DECREE

This case comes before the Court on plaintiff's complaint for declaratory and injunctive relief brought under 42 U.S.C. § 1983 and on the cross-motions of the parties for summary judgment. For the reasons set forth by this Court in its opinion of even date herewith, (1) summary judgment is hereby granted in favor of plaintiff and denied to defendants;[9] and (2) it is hereby, this *30th* day of December, 1976, DECLARED, ORDERED, ADJUDGED and DECREED: Defendants,[10] their officers, agents, employees and successors shall not prohibit or restrict the use by plaintiff MaryPIRG of SGA appropriations for litigation activities which are conducted by MaryPIRG to protect its interests as an organization, or to enable it to gather information relating to public interest concerns which affect students at the College Park Campus of the University of Maryland, or to advocate the public interest in connection with issues which concern and affect those students. Further, defendants shall not limit or withhold use of past SGA appropriations for Mary-PIRG or of approval of future SGA appropriations for MaryPIRG, in order to interfere with MaryPIRG's use of such funds for such litigation activities.

---

9. *See* n.10, *infra.*

Costs of this case shall be borne by defendants.

---

10. No relief is granted against the Board of Regents and summary judgment is hereby entered in favor of that defendant.