SPARTACUS YOUTH LEAGUE, an unincorporated association, Sandor John, Nay Foggs, Susan Pickgrobe, and Thomas Tank, Plaintiffs,

v.

BOARD OF TRUSTEES OF the ILLINOIS INDUSTRIAL UNIVERSITY, Honorable James R. Thompson, Governor, as Ex–Officio Member of the Board of Trustees of the Illinois Industrial University, George W. Howard III, William D. Forsyth, Jr., Ralph C. Hahn, Robert J. Lenz, Park Livingston, Earl Langdon Neal, Jane Hayer Rader, Nina T. Shepherd, Arthur R. Velasquez, Individually and as Member of the Board of Trustees of the Illinois Industrial University, Dr. Donald H. Riddle, Individually and as Chancellor of the University of Illinois Chicago Circle Campus, and Willie E. McKay and Stanton Delaney, Individually and as Officials of the University of Illinois Circle Campus, Defendants.

No. 78 C 1224.

United States District Court, N. D. Illinois, E. D.

April 2, 1980.

790

David C. Thomas, Edward T. Stein, Singer & Stein, Chicago, Ill., for plaintiffs.

John C. Tucker, Barry Sullivan, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This is a civil rights action brought under the First Amendment, the Fourteenth

Amendment and 42 U.S.C. § 1983, challenging regulations governing the sale and distribution of literature at the University of Illinois' Chicago Circle Campus. The plaintiffs are the Spartacus Youth League, two University of Illinois students and two non-students. The defendants are members of the Board of Trustees of the University of Illinois and certain officials at the University's Chicago Circle Campus. The plaintiffs seek both a declaration that the challenged regulations are unconstitutional and an injunction preventing the defendants from enforcing them. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, § 1343(3), § 1343(4), § 1651, § 2201, § 2202, 42 U.S.C. § 1981, § 1983, § 1988 and under the First and Fourteenth Amendments. Plaintiffs have now moved for a preliminary injunction.

## I. *Background*

University of Illinois, Circle Campus is a publicly owned and operated commuter school which includes classrooms, administration buildings, recreation areas and parking facilities. The student union, known as Circle Center, is described in the University's student handbook as "the hub of campus activities." The Center contains a wide variety of facilities, including lounges, four food service areas, recreational facilities, the main bookstore, a travel agency, a post office, student organization offices and meeting rooms for campus and community functions. The general public is invited to numerous lectures, forums and discussions in the Center. Recent studies show that the Center is used by 10,000 persons each day. Persons entering the Center need not show any student identification.

Registered student organizations are permitted to reserve booths from which they may conduct discussions with and distribute literature to passersby in the main lobby on the second floor of the Center. A large number of people frequent the area since it is situated immediately outside one of the public food service areas and at the head of the escalators. The University requires that membership in a registered student organization be limited to students, faculty and staff of the Circle Campus. To become a registered student organization, the group must submit a statement containing the name, purpose, membership requirements of the organization, officeholders, the number of members, and a faculty supervisor. There are over 190 registered student organizations on Circle Campus, including the Spartacus Youth League (SYL). Status as a registered student organization entitles the group to money from a Student Activities Fund.

In July, 1975, the University promulgated various regulations outlining the manner in which goods and literature could be distributed. [See Appendix]. The regulations specified that free printed materials could only be distributed by students, faculty or staff of Circle Campus. The material was required to bear the name of the issuer and the distributor was required to furnish identification upon request. Distribution in Circle Center was confined to assigned booths or to an area near the escalators.

University regulations also discussed the sale of materials. Sales of merchandise were generally prohibited, except in designated University shops. All salesmen and vendors were required to obtain prior authorization to be present on campus. Registered student organizations had somewhat greater latitude. They were permitted to sell publications and engage in fund-raising. Sales of publications, however, required advance written approval, necessitating submission of a statement describing the name of the organization, the date of the sales, the things to be sold, and the names of the sellers. In 1975, only University students and personnel were permitted to sell items on behalf of registered student organizations. All proceeds of sales and other fund-raising activities were required to be deposited in a University account under the organization's name.

During the fall of 1977, Sandor John, a member of SYL but not a student, was present on the campus on numerous occasions to distribute literature for the SYL. The SYL is a registered student organiza-

tion with less than ten members. It maintains a booth at the Center with fairly regular weekday hours. SYL political literature is distributed from the booth. Its members sometimes ask for, but never require, contributions for the materials. Examples of such literature include a flyer announcing a series of classes covering the fundamentals of Marxism, handbills protesting claimed University harassment of leftist campus organizations, and the Worker Vanguard, which describes itself as a Marxist working–class newspaper. SYL also distributes literature on the outdoor walkways within Circle Campus.

On several occasions in the fall of 1977, defendants McKay and Delaney warned John that he could not distribute SYL's political literature because he was not a student, faculty or staff member of the University. The defendants state that they sought to prevent John from selling literature in the Center lobby. In his affidavit, John states he was told that he could not distribute literature either with or without charge at Circle Center or elsewhere on the campus.

On November 22, 1977, Mr. Rothenbaum and Mr. Delaney of the University staff, asked John to stop selling newspapers on the second floor. John refused and Delaney phoned the campus police. Officer Mel Walker told John he would be arrested for criminal trespass unless he discontinued his sales activities. John maintained that the regulations violated his constitutional rights, and stated his intention to continue selling newspapers in the lobby. Walker then arrested John and escorted him to Chicago police headquarters, where Rothenbaum signed a criminal trespass complaint against him.

Acting on the University's complaint, the State's Attorney initiated a criminal misdemeanor action charging John with criminal trespass to state–supported land, 1977 *Ill. Rev.Stats.*, Ch. 38 § 21–5. On August 15, 1978, Judge John McDonnell dismissed the complaint, resting his decision on the ground that the University regulations prohibiting distribution of literature by persons who are not students, faculty or staff were unconstitutional as applied to John's conduct. Judge McDonnell also found that the Circle Center lobby was a "public forum" within the meaning of *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) and thus subject to the requirements of the First and Fourteenth Amendments.

The plaintiffs filed suit in this court on April, 1978, and sought a preliminary injunction enjoining enforcement of the challenged regulations. Before that motion was decided, the University of Illinois on December 19, 1978 amended their regulations to permit distribution of literature by persons like John, who although not themselves students, faculty or staff of the University, wish to distribute literature on behalf of registered student organizations.[1]

---

1. Section II.B.3.:

Student organizations must request and receive written permission to sell publications in advance of the sale through the Office of Organizations and Activities. Such requests must include the name of the organization, the dates of sales, what will be sold, and the names of the people who will do the selling. Only registered students, faculty or staff of the University of Illinois and persons who are "non–University agents", as hereinafter defined, or a registered student organization will be permitted to sell or distribute publications or visual materials for registered student organizations. To qualify as a "non–University agent" of a registered student organization a person must be so identified in its written request for permission to sell publications or in writing filed with the Director of Organizations and Activities prior to any free distribution of visuals under Section C.

of this Part II. Each non–University agent of a student organization must carry identification as such in a form prescribed by the Director of Organizations and Activities and must comply with provisions of the Student Code to the same extent as students who are members of the student organization.

A registered student organization which designates a non–university agent shall be fully responsible for any actions of the agent which violate the provisions of the Student Code, and shall require the agent to remit to the student organization all funds collected by the agent which shall be accounted for by the student organization in accordance with the requirements of Part II, Sec. B. of the Student Code.

Section II.C.1.a.:

All materials distributed by handout must identify the issuing persons or organizations. Such materials may be distributed only by Chicago

In January, 1979 the defendants filed a motion to dismiss the complaint as moot, in light of the amended regulations.

The plaintiffs filed their first amended complaint on May 21, 1979, joining three additional plaintiffs and seeking a preliminary injunction. The party plaintiffs now include the Spartacus Youth League and four individual party plaintiffs: 1) Sandor John, a non–student affiliate of SYL, a registered student organization, 2) Nay Foggs, a student and member of a registered student organization, 3) Thomas Tank, a student but not a member of any registered student organization and 4) Susan Pickgrobe, a non–student without any affiliations with Circle Campus.

In their amended complaint and motion for a preliminary injunction, the plaintiffs argue that the Circle Center and the outdoor walkways on campus are public forums deserving the highest constitutional protection and that the University regulations go beyond permissible controls on the time, place and manner of speech activities in public forums by discriminating between speakers based upon their status as University insiders or outsiders. They further contend that the insiders and "non–University agents" face written permission and identification requirements which are vague, overbroad and abridge their rights to freedom of speech and association. They argue that since any attempted distribution will subject the plaintiffs to possible arrest, criminal prosecution or harassment, the regulations have a chilling effect on the exercise of their rights and that irreparable injury caused by these restrictions justifies preliminary relief.

In response to the plaintiffs' motion, defendants argue that the standards for issuance of a preliminary injunction have not been met. The defendants state that the plaintiffs have not alleged that they have refrained from the distribution and sale of written materials at the Circle Center or on Circle Campus. Absent such attempts and official enforcement of the regulations, defendants say that the plaintiff's challenge does not present a controversy that is ripe for judicial decision. They urge that the plaintiffs have not shown a likelihood of success on the merits. While some portions of Circle Campus may be devoted to public purposes, they contend, it is not a quintessential public forum with unlimited public access.

In this case, according to the defendants, the minimal injury to the plaintiffs caused by the prohibition on non–member sales is outweighed by the University's interests in 1) protecting the educational character of the campus from an invasion of outside commercial vendors and 2) protecting the treasuries of student organizations from potential looting by persons who are outside the University's supervisory powers. They further contend that the identification and written permission requirements are reasonable in light of the special needs of the University. Finally, defendants urge that disputed factual issues must be resolved in an evidentiary hearing before an injunction may issue.

 Before reaching the merits of this claim, the court will consider two preliminary matters. The Illinois state court addressed some of the same factual and legal issues that are presented here when it dismissed criminal trespass charges against Sandor John. That court considered whether the Circle Center lobby is a public forum for First Amendment purposes and whether University regulations on literature distribution in that area contravened John's right of free speech and assembly. The University regulations as applied to John were changed after that decision. This court will consider whether that action has a preclusive effect on the defendants to the present action. Federal courts have recognized that a prior state judgment may work an estoppel in a subsequent § 1983 action brought in federal court. *Heidelberg v. Hammer*, 577 F.2d 429, 432 n.1 (7th Cir. 1978). The applicability of collateral estoppel principles to federal cases is a byproduct of a federal

Circle faculty, staff or students and non–University agents of student organizations as

defined and regulated in Paragraph II.B.3 above.

statute, implementing the full faith and credit clause of the Constitution, which requires federal courts to give a prior state judgment the same conclusive effects as would the courts of that state. 28 U.S.C. § 1738; see *Winters v. Lavine*, 574 F.2d 46, 54 (2d Cir. 1978). Under this section, a federal court must look to state law to determine the scope of the estoppel. Under Illinois law, the doctrine of collateral estoppel operates to bar relitigation of issues of fact or law which were actually decided in and necessary to the prior judgment, even if the second suit is based on a different cause of action. *See People v. Borchers*, 67 Ill.2d 578, 10 Ill.Dec. 346, 367 N.E.2d 955 (1977). However, for the doctrine to apply, the parties as well as the issues in the two lawsuits must be the same. *People v. Williams*, 59 Ill.2d 557, 322 N.E.2d 461 (1975). The defendants in the present action were not parties to the state criminal proceeding, and did not have a full and fair opportunity to defend the constitutionality of the University regulations. Therefore, collateral estoppel does not apply to foreclose relitigation of the constitutional issues.

■ Nonetheless, even though there is no formal estoppel, the state court judgment provides authority supporting plaintiffs' claim that they have a probability of success on the merits of their action. Given the state court's perhaps primary interest in enforcing state criminal laws, and the presumption of regularity which may attach to the policies of a major university, the state court's acceptance of John's constitutional theories will be considered by this court.

## II. *Justiciability*

This court must also consider defendants' arguments that plaintiffs lack standing to maintain this action and that the controversy is not ripe for judicial action. Both contentions fall under the rubric of justiciability. The defendants assert that the plaintiffs have not been injured by University regulations since none has alleged that he or she has refrained from the distribution and sale of written materials at the Circle Center. Other than John, none has

ever been prosecuted, charged or arrested under University regulations. In defendant's view, the plaintiffs' action is no more than "a search of state statutes and city ordinances [or University regulations] with a view to picking out certain ones that ... might possibly be used by the authorities as devices for bad–faith prosecutions." *Boyle v. Landry*, 401 U.S. 77, 81, 91 S.Ct. 758, 760, 27 L.Ed.2d 696 (1971).

Plaintiffs argue, on the other hand, that their First Amendment rights have been chilled by the existence of the challenged regulations, the threat of their enforcement and the knowledge of John's arrest for exercise of those rights.

■ The standard for justiciability determinations is "... whether the facts alleged ... show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant ..." judicial review. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The test is an imprecise one, with only the opposite poles of the factual continuum providing clear guidance. A plaintiff need not invariably wait until he has been directly subjected to a law or policy before he brings a judicial challenge, but he cannot go to court simply by showing that a regulation exists and that he believes it will be enforced against him. *National Student Association v. Hershey*, 412 F.2d 1103, 1110 (D.C.Cir.1969). Between these principles fall the majority of the cases, where the probability of several contingencies must be evaluated on a case–by–case basis: "... the likelihood that the complainant will disobey the law, the certainty that such disobedience will take a particular form, any present injury occasioned by the threat of prosecution, and the likelihood that a prosecution will actually ensue." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 n.29, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974).

■ In the First Amendment area, however, a somewhat relaxed standard of uncertainty is applicable. Injury to First

Amendment rights may result from the threat of enforcement itself, since it may chill the plaintiff's ardor and eliminate his desire to engage in protected expression. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); 13 Wright, Miller & Cooper, Federal Practice & Procedure § 3532, at 245 n.29 (1975). "The threat of sanctions may deter their [First Amendment rights'] exercise almost as potently as the actual application of sanctions." *Dombrowski v. Pfister, supra; NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Although not every chill will create a justiciable controversy, it may be enough that the plaintiff raises "a credible threat of enforcement and plausible allegations of intent or desire to engage in the threatened activities . . ." *Hershey, supra*, 412 F.2d at 1111–12; see also *Thoms v. Heffernan*, 473 F.2d 478, 483–85 (2d Cir. 1973), *vacated and remanded on other grounds* 418 U.S. 908, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *Smith v. Boyer*, 442 F.Supp. 62 (W.D.N.Y.1977).

The present suit involves four individual plaintiffs. Each desires to distribute literature but believes that the University regulations unconstitutionally infringe upon their First Amendment rights. To distribute literature under these circumstances would require them to submit to what they believe are unconstitutional regulations or risk prosecution by failing to comply with them. Each is aware of John's arrest and the University's intent to enforce its own regulations. Each fears the expense, risk, humiliation and impairment to his or her livelihood which would result from the enforcement of the regulations against them.

■ Plaintiff Susan Pickgrobe has no University affiliations and is not a member of any registered student organization. The regulations clearly prohibit her distribution of literature on Circle Campus. A request to distribute materials would be futile in light of the clear ban which the regulation provides. This court finds that there are sufficient facts to create a justiciable controversy concerning the regulations prohibiting her distribution of free and paid literature on campus.

■ Both Nay Foggs, a student member of an unnamed registered student organization and Sandor John, a non–student member of SYL, may distribute literature by adhering to University regulations which require them to receive written permission and divulge organizational affiliations. Based upon their representations, this court finds that the regulations regarding the manner of distribution of literature sufficiently ripe for decision.

■ Thomas Tank, a student at Circle Campus, is not a member of any registered student organization. In his affidavit, he states that he is prohibited from distributing literature anywhere on campus. The defendants represent that he may distribute free literature without membership in a registered student organization but may not sell literature. Tank alleges a chilling effect from these regulations which this court will consider.

III. *Standards for issuance of a preliminary injunction.*

Defendants argue that plaintiffs have not satisfied the standards for issuance of a preliminary injunction. A preliminary injunction will not issue unless plaintiffs establish: 1) that they have a substantial likelihood of success on the merits; 2) that they will be irreparably injured if preliminary relief is denied; 3) that others will not suffer serious adverse effects if relief is granted and 4) that the ultimate public interest lies in the protection of the constitutional rights which plaintiffs assert. *Wynn v. Scott*, 448 F.Supp. 997, 1001 (N.D. Ill.1978); *aff'd sub nom. Wynn v. Carey*, 582 F.2d 1375 (7th Cir. 1978); *Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882, 901 (N.D.Ill.1975), *aff'd in relevant part*, 540 F.2d 1062 (7th Cir. 1976), *on rehearing*, 548 F.2d 715 (1977). Defendants question plaintiffs' showing on each of these requirements.

A. *The plaintiffs have shown a likelihood of success on the merits*

In evaluating the merits of plaintiffs' claims, we begin with the proposition that

the distribution of literature, especially political literature, is important First Amendment activity. *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921 (7th Cir.), *cert. denied* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *New Left Education Project v. Board of Regents*, 326 F.Supp. 158 (W.D.Tex.1970), *vacated on procedural grds.*, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972), *on remand*, 472 F.2d 218 (5th Cir. 1973), *vacated as moot*, 414 U.S. 807, 94 S.Ct. 118, 38 L.Ed.2d 43 (1973). The literature is no less protected because it is sold. *New York Times v. Sullivan*, 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786 n.23, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707, *rehearing denied* 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 150 (1978). The sale of a newspaper or other communicative material is conduct which combines both speech and non–speech elements. *Jacobs v. Board of School Commissioners*, 490 F.2d 601 (7th Cir. 1973), *vacated as moot*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). The speech element is not at issue here. It is undisputed that the challenged University regulations exert no censorship or control over distributed literature on the basis of its expressive content. The present dispute focuses solely on the non–speech elements of First Amendment activity. Specifically, the question is whether the regulations impose an impermissible restraint on the flow of ideas by unduly limiting the channels for their communication. In answering this question, we must carefully define the character of the place where the communicative activity has occurred.

1. *Circle Center is a public forum and must be made available on a nondiscriminatory basis*

In a series of cases, the Supreme Court has determined that citizens have a constitutional right to use certain governmental property as public forums. That label signifies a special constitutional status prohibiting the state from regulating speech–related conduct in such places except by reasonable, nondiscriminatory regulations governing time, place and manner. Once those regulations are shown to impinge upon First Amendment interests, the burden is on the state to demonstrate that the regulations are necessary to serve compelling governmental interests.

In determining whether an area is a public forum, courts have looked at the character of the place, its usual activities and whether its historical dedication has been to the exercise of First Amendment rights. Courts have also sought to determine whether the manner of expression is compatible with the normal activity of a particular place at a particular time. Using these criteria, streets, parks and sidewalks have been found to constitute public forums. *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). The special characteristics of military installations *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) and jails *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) *rehearing denied* 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed.2d 559 (1967) have been found to require stricter security measures and thus do not constitute public forums. Other public areas, such as a bus terminal *Wolin v. Port of New York Authority*, 392 F.2d 83 (2d Cir.), *cert. denied* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968) public airport *Chicago Area Military Project v. City of Chicago, supra*, welfare office *Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319 (2d Cir.), *cert. denied* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) and a public library *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) have also been characterized as public forums for First Amendment purposes.

A public university, although not created mainly for public interchange, is an important area for a broad range of communicative activities. The college campus is a peculiarly fertile environment for the exchange and dissemination of ideas. Stressing this fact, plaintiffs insist that the Circle Center and outdoor walkways at the University have been dedicated to the promotion of expressive activities, to the sharing of thoughts and to the meeting of people to

discuss current issues and therefore constitute "public forums". Various cases support their conclusion that a university is a public forum. *Jones v. Board of Regents*, 436 F.2d 618 (9th Cir. 1971); *Brubaker v. Moelchert*, 405 F.Supp. 837 (W.D.N.C.1975); *Dunkel v. Elkins*, 325 F.Supp. 1235 (D.Md. 1971); *Hammond v. South Carolina State College*, 272 F.Supp. 947 (D.S.C.1967).

The defendants, on the other hand, emphasize that Circle Campus is primarily an educational institution, not a political forum or commercial center, and that the University is public property dedicated to a special use. Although the University allows the public to use the campus for limited purposes, the defendants say that the University has a responsibility to preserve the ambiance of the Center for the study, recreation and relaxation of its members. Defendants suggest that the targeted areas are not public forums and that, accordingly, their burden of justification for the regulations need only be tested by a reasonableness standard.

■ This court believes that Circle Center and the campus walkways are "public forums". The Center, as the hub of campus activities, offers and advertises a wide variety of services in the building. The Center is used by various political and social organizations to espouse their ideas through reservation of booths. Speakers have appeared to discuss issues at the Center. Circle Center is customarily used by students to meet and discuss issues. Peaceful distribution of literature is compatible with the normal activity of the student union.

■ It is certainly true that a university may promulgate reasonable rules and regulations governing conduct within the university. *Esteban v. Central Missouri State College*, 415 F.2d 1077 (8th Cir. 1969) *cert. denied*, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970). It has the right to protect its property, avoid disruptions of the educational process and maintain order *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1971)–i. e. it may preserve such tranquility as the facilities' central purpose requires. See Tribe, *American Constitutional Law* at 690. It may prohibit "material and substantial" interruptions within the classroom, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) or noise and diversions which interrupt school activities. *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Indeed, a university may impose a greater array of time, place and manner restrictions than would be allowed in other types of public forums. This, however, does not lessen or negate its quality as a public forum.

■ Running parallel to the principle that the expressive conduct must be compatible with the normal activity of the facility is the proposition that the channels of communication which are provided must be made available on a non–discriminatory basis. Once the state has determined that certain First Amendment activities are appropriate at a particular location, it may not arbitrarily decide that certain individuals may use its facilities while others may not. See *Jones v. Board of Regents, supra; Dunkel v. Elkins, supra*. Selective exclusions from a public forum must be carefully scrutinized to insure that they do not run afoul of the equal protection clause. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). In particular, the guarantee of equal protection prohibits exclusionary policies based on the identity of the speaker. "The inherent worth of the speech in terms of its capacity for informing the public does not depend on the identity of its source, whether corporation, association, union or individual." *First National Bank of Boston v. Bellotti, supra*, 435 U.S. at 777, 98 S.Ct. at 1416. State policies which restrict the speakers who may address a public issue must be justified by a compelling state interest. *Id.* at 785–86, 99 S.Ct. at 1420–21.

With these principles in mind, we turn to an analysis of the various plaintiffs' claims of First Amendment infringements. Susan Pickgrobe is challenging the amended regulation which prohibits all who are not students, faculty or staff from the distribution

and sale of literature unless sponsored by a registered student organization. Under this regulation there is a flat ban on Pickgrobe's expressive rights since she has no affiliations with the University.

There can be no doubt that these regulations impose a substantial burden on Pickgrobe's protected speech activities. They have effectively halted her distribution of political literature on campus. The inability to reach students in a building which is at the center of campus life is an obvious inhibition on protected speech.

There is also no doubt that the regulations draw a distinction between those who can and cannot distribute literature, with or without charge, based on the identity of the distributor.

To justify the discrimination in access to established channels of communication, defendants set out two rationales which they characterize as compelling. First, the regulations preserve the educational ambiance of the campus and prevent the disruption which would otherwise result from outside vendors seeking to take advantage of a convenient student market. Defendants suggest that their commuting students are a "captive audience" for such vendors since they must use the Circle Center and open spaces for campus activities and have no residence halls in which they may take refuge. They emphasize that outsiders have alternative methods of communication which are easily available, since 75% of the campus is surrounded by four major public thoroughfares which must be crossed by all members of the University community. And they urge that the Center's functions as an area for study, relaxation and recreation is wholly incompatible with unrestricted sales and distributional activities.

The Court of Appeals for this circuit has recognized, in the high school context, that school authorities have a legitimate interest ". . . in limiting or prohibiting commercial activity on school premises by persons not connected with the school, either acting directly or through students as agents." *Jacobs v. Board of School Commissioners, supra,* at 608. But it does not follow that any rule restricting outsiders is immune from constitutional attack. Even legitimate state interests "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). The *Jacobs* court ultimately rejected the proffered interest of commercial disruption, finding that the regulation of the time, place and manner of distribution could "adequately serve the interests of maintaining good order and an educational atmosphere." *Id.* at 609.

The University may well have a legitimate interest in regulating purely commercial activity, but its regulations go far beyond that interest. Its restrictions on the sale of literature, for instance, reach those such as plaintiffs who may wish to obtain some payment to assist in meeting the costs of publishing the literature they distribute. Solicitation for contributions is, in those circumstances, an incident to the espousal of ideas. "Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Village of Schaumberg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

By broadly prohibiting all literature sale and distribution by outsiders without University affiliations, defendants have failed to draft their regulations with the "small caliber precision" required for rules impinging on First Amendment rights. *New Left Education Project, supra,* at 164. By permitting distribution and sales activities at the Circle Center and the outdoor walkways by a limited class of people, defendants have determined that such activities in these areas are not disruptive of school functions. Indeed, a University statement

in its Campus Policies and Regulations, p. 51, recognizes this fact, stating that "the distribution of printed matter in places of general public access and the exercise of other forms of expression that are not disruptive of the customary use of various University facilities are not to be restricted." Once that determination has been made, the University cannot limit access solely on the basis of the identity of the speaker. Defendants have made no showing whatsoever that outside distributors of political literature are more disruptive of campus functions than insiders who perform the same task, and we do not believe defendants could meet such an evidentiary burden. See *New Left Education Project, supra; Jacobs, supra; Brubaker v. Moelchert, supra; Hernandez v. Hanson,* 430 F.Supp. 1154, 1161 (D.Neb.1977).

Defendants seek to bolster their argument that distribution by outsiders would be disruptive by urging that commuting students are a captive audience, or that alternative distribution sites are adequate substitutes. These arguments are without merit. We are singularly unpersuaded that college–age adults passing a leafleteer on a campus walkway or in a student union cannot as readily avoid exposure to an unwanted communication urged upon him by an outsider as one distributed by a person related to the University. We are also unconvinced that off–campus distribution of newspapers on a surrounding street is remotely akin to distribution of those materials in a building used by 10,000 persons per day and in an area specifically reserved for discussions and distribution of literature. In addition, an individual "is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). Finally, the University remains free to impose proper place, time and manner restrictions, as it now does by, for example, forbidding interference with pedestrian traffic. Therefore, defendants' claim of disruption is a wholly unsatisfactory rationale for its blanket discrimination against outsiders.

Defendants' second justification for the regulations applies only to the ban on outsider selling, not free distribution. They note that the University requires all funds raised by student organizations to be deposited in University accounts. The deposit requirement is designed to prevent misappropriations. Since the University has no supervisory power over outsiders, defendants contend that it would be impossible to enforce this deposit requirement if outsiders were allowed to sell literature.

Again, we do not believe that a regulation cannot be framed to protect the integrity of funds solicited by student organizations sharing in University funding without forbidding all outsiders to engage in sales activity. The University may be able to achieve the same objective of fiscal responsibility by imposing strict reporting requirements on student members who coordinate all sales activity.

We conclude that plaintiff Pickgrobe has demonstrated a substantial likelihood that the challenged University regulations prohibit protected speech in a manner unjustified by any compelling state interest.

### 2. *Written permission and identification requirements*

The University requires that those persons who can distribute literature submit to various procedures before doing so. The plaintiffs challenge these procedures, which include prior written permission before distribution and identification of both organizational affiliation and individual distributor as unduly stifling of their expressive rights. This court will examine the constitutionality of those requirements.

The regulations specify that "student organizations must request and receive 'written permission to sell publications in advance of the sale through the Office of Organizations and Activities." Such permission is only required for the sale of literature and does not apply to free distribution of materials. The plaintiffs urge that rules subjecting the exercise of First

Amendment activities to prior approval are inherently suspect and bear a heavy presumption against their constitutional validity, citing, *inter alia, Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). They argue that the regulation gives University officials discretion to grant or deny permission to sell literature without providing definite, narrow and objective standards to govern such discretion. Finally, they allege that the regulations do not provide due process procedures for denial of permission or appeal from an adverse ruling.

The regulation itself simply requires advance approval prior to selling literature. It offers no suggestion as to how that determination is made, what factors are considered or what rights the organization has if it is denied permission. In *Fujishima v. Board of Education*, 460 F.2d 1355 (7th Cir. 1972), the Seventh Circuit found a rule which required prior approval before distribution of publications an unconstitutional prior restraint. That court held that schools may not restrain the full First Amendment rights of its students, one of which is the freedom to distribute material without prior censorship. *Id.* at 1357. See *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Quarterman v. Byrd*, 453 F.2d 54 (4th Cir. 1971); *Marin v. University of Puerto Rico*, 377 F.Supp. 613 (D.P.R.1973). The plaintiffs rightfully suggest that prior restraints, such as the scheme at issue in the instant case, bear a heavy presumption against their constitutionality.

For the regulation to be upheld, it must provide some specific standards to guide the University officials' exercise of discretion. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Jones v. Board of Regents, supra.* Moreover, it must provide procedural safeguards including a prompt administrative review of the officials' determination. *See Freedman v. Maryland*, 380 U.S. 51, 58–9, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965); *International Soc. for Krishna Consciousness, Inc. v.*

*Rochford*, 585 F.2d 263, 271–2 (7th Cir. 1978). The University's regulation clearly fails to meet any of these constitutional requirements.

To maintain this regulation, the defendants must show that it is either a reasonable time, place and manner restriction or that it is justified by a compelling state interest. The defendant contends that its primary purpose is to regulate use of limited campus facilities by numerous registered student organizations. They also argue that it is necessary to enforce disciplinary actions taken which might legitimately restrict student participation in non–academic student activities. They deny that the defendant has discretion to reject an application for written permission absent a specific disciplinary problem and urge that in no case has a student organization been denied permission to sell when it was registered, had completed an application and had a student organization fund account.

■ Upon examination, the defendants' arguments appear to be without merit. Although the defendants' purpose of regulating the use of limited campus facilities is a legitimate time, place and manner concern, the regulation accomplishes substantially more than that. The defendants are in a position arbitrarily to deny written permission applications, without using any guidelines or providing any recourse for disappointed plaintiffs. The University's claim that it routinely approves those applications is beside the point; if University officials do not intend to exercise the discretion the regulation allows, then the regulation should be framed in a manner preventing it. If they desire to have some discretion, then it must conform to the constitutional requirements set forth above. This court does not believe that overcrowding cannot be prevented by some lesser means.

Student distribution at Circle Center is apparently permitted both at booths furnished by the University for that purpose and reserved by student organizations in advance or at designated areas near the escalators. We do not suggest that the

University is obligated to offer its limited booth facilities to persons unrelated to the University, that it may not require prior reservation of those spaces upon proper application, that it cannot insist upon proper identification by persons using those facilities, or that it cannot restrict the distribution of literature to defined areas in the Circle Center. Again, however, the regulations before this court are overly broad. They apply not only to booth space but also to all other areas of the Circle Center; they vest in the University an unlimited discretion.[2]

The challenged identification requirements further specify that each handout must identify the issuing persons or organizations. The individual who intends to sell publications must also be identified, although there is no such requirement for distribution of free literature.

The plaintiffs argue that they have a right to remain anonymous in carrying out political activities, citing, inter alia, Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). They contend that the identification requirements and fear of reprisal might deter protected activities and therefore infringe upon their First Amendment protections.

The defendants offer two justifications for the regulations. They state that if the individuals actually collecting funds are not identified, it would be difficult to prevent misappropriations of student funds. Once again, they explain the University procedure which requires that all funds raised by student organizations be deposited in University accounts.

 The defendants further contend that the requirement that handouts identify their source is also aimed at insuring that individuals and student organizations do not fraudulently engage in "dirty tricks". Ac-

cording to the defendants, the regulation was promulgated in the late 1960's in response to problems that arose when individuals and groups used anonymity as a cloak behind which to distribute unpopular or inflammatory literature, and that literature was thereafter attributed to a rival or otherwise disliked organization. The defendants state that organizations complained of being held responsible for the unauthorized posting of buildings with literature that they, in fact, had not issued.

In *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Supreme Court struck down a Los Angeles ordinance which required that all handbills identify the name and address of the person who printed, wrote, compiled, manufactured and distributed the material. The Court emphasized that "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." *Id.* at 65, 80 S.Ct. at 539. The defendants in that case urged that the ordinance was designed to "identify those responsible for fraud, false advertising and libel." *Id.* at 64, 80 S.Ct. at 538. The Court rejected their argument stating that the specific ordinance was "in no manner so limited, nor" had they "been referred to any legislative history indicating such a purpose." The majority specifically reserved the question of whether identification requirements limited to prevent fraud, false advertising, libel "or any other supposed evils" *Id.* at 64, 80 S.Ct. at 538 would be constitutional. *See Jacobs v. Board of School Commissioners, supra* at 607.

In the instant case, the defendants promulgated their regulation in response to a specific historical experience of fraud. Given the prior history of difficulty that the University has had, this court finds it sufficient justification to maintain the part of the regulation which requires that handouts identify their source.

---

**2.** Although plaintiffs raise a question respecting the definition of "general merchandise locations", the parties have not focused on appropriate place restrictions in Circle Center because the present regulations emphasize

"whether" rather than "where". This court does not have before it any question whether the escalator area is a permissible place restriction.

This court also believes that the plaintiffs' reliance on *NAACP v. Alabama, supra* and its progeny is misplaced. In that case, an organization was asked to disclose membership lists to a municipality. There was "an uncontroverted showing that on past occasions revelation of the identity of its rank and file members had exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* 357 U.S. at 462, 78 S.Ct. at 1172. The plaintiffs have made no such showing of harm in this case. In the instant case, an organization need not disclose the names of its members. The regulation merely requires identification of the issuing parties to prevent fraud. *See United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954) (requirement that lobbyists identify themselves upheld); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (disclosure requirements of the Federal Election Campaign Act upheld). This court will not presume any likelihood that a university will engage in reprisals for the espousal of unpopular ideas.

The requirement that an individual distributor be identified is largely justified by the university's attempt to prevent against misappropriation of funds. A provision comparable to this one was found unconstitutional in *Talley, supra*. Unless this regulation is construed as a narrowly drawn attempt to serve a specific, legitimate purpose, it will not survive this court's scrutiny.

This court believes that the misappropriation justification does not meet that test. Once the handbill is identified, the University will know its source. If the University is entitled to an accounting it can so require.

### B. The plaintiffs have shown that they will be irreparably injured if preliminary relief is denied

Defendants next contend that plaintiffs have not shown that they will suffer substantial harm if the injunction does not issue. It is undisputed, however, that Susan Pickgrobe is prohibited from distributing literature inside the Circle Center. It is also undisputed that the other plaintiffs must submit to identification and written permission requirements. These facts constitute an adequate showing. "Even the temporary deprivation of First Amendment rights constitute irreparable harm in the context of a suit for an injunction." *Citizens for a Better Environment v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975). Threats of arrest for engaging in protected speech are sufficiently chilling to show irreparable injury *Chicago Area Military Project v. City of Chicago, supra.* at 926, and an actual prior arrest indicates the University's continued intention of enforcing its own regulations.

### C. The defendants will not suffer serious adverse effects if relief is granted

Defendants also argue that the plaintiffs' injury is minimal, when compared to the injury to defendants which would result from the issuance of a preliminary injunction. Defendants define that injury in terms of the same University interests which they cited in their argument on the merits of plaintiffs' claims. Thus, they state that the prohibition on outside vendors preserves the educational and recreational character of the campus from commercial disruption, and guards against the possible misappropriation of monies deposited in the University accounts of student organizations. As noted earlier, these interests can be adequately served by more narrowly drawn regulations. Therefore, we find that the balance of hardships tips in plaintiffs' favor.

### D. The ultimate public interest lies in issuance of a preliminary injunction

This court also finds that the ultimate public interest lies in the protection of the Constitutional rights which plaintiffs assert. The plaintiffs have made a strong showing that the challenged University regulations have an inhibitory effect on protected speech activities and that those ac-

tivities do not create substantial interference with the pattern of normal activities of the institution or with the rights of others. In the final analysis, the plaintiffs' complaint cries out for application of the Constitutional principle that the government cannot dictate which speakers may address a public issue. *Bellotti, supra*, 435 U.S. at 785, 98 S.Ct. at 1420. The present regulations contain the implicit notion that university students are fragile buds which must be nurtured in a controlled and protected environment if they are to blossom. That notion is incompatible with the First Amendment.

IV. *An evidentiary hearing is not required*

The defendants' final argument is that the record contains several factual disputes which must be aired in an evidentiary hearing before an injunction may issue. Without pointing to any specific conflict in the affidavits, they identify two broad areas of dispute: the alleged injury to the plaintiffs and the character and function of Circle Center. No greater specification or sharpening of these issues is provided.

██ From our review of the record, we find no serious dispute about the facts. As to the issue of the character and function of Circle Center, the facts alleged in the affidavits are sufficient to support a preliminary injunction. As to the injuries alleged, the plaintiffs and defendants do not disagree about the activities engaged in by the parties. It is uncontroverted which regulations apply to which plaintiffs and only the legal effect of those regulations is in dispute. This court, therefore, finds no substantial factual dispute. In the absence of a factual controversy, this court has the discretion to grant a preliminary injunction upon the affidavits alone, without an evidentiary hearing. See 11 Wright & Miller, *Federal Practice and Procedure*, § 2949 at 478 (1973).

The plaintiffs' motion for preliminary injunction will be granted. Plaintiffs are directed to submit a draft order in conformity with this memorandum.

APPENDIX

*General Policy on Visual Communications*

II. B.

B. *Sale of Newspapers, Literature, Periodicals*

1. The general sale of newspapers, periodicals, magazines, and like matter, is restricted to University general merchandise sales locations. The Director of the Chicago Circle Center is responsible for these merchandising areas. He, in turn, may consult with Chicago Circle Center Board on questions that may arise.

2. Registered student organizations may reserve a booth in the Chicago Circle Center for the purpose of selling publications after permission has been granted for such sale by the Director of Organizations and Activities, acting for the Committee on Student Affairs.

3. Student organizations must request and receive written permission to sell publications in advance of the sale through the Office of Organizations and Activities. Such requests must include the name of the organization, the dates of sales, what will be sold, and the names of the people who will do the selling. Only registered students, faculty, and staff of the University of Illinois will be permitted to sell for registered student organizations.

Registered student organizations wishing to sell publications from a fixed outdoor location must see that placement of any tables, chairs, etc., satisfies safety requirements and does not interfere with automobile and pedestrian traffic. Student organizations may requistion tables, chairs, and other physical needs, for sales through the Office of Organizations and Activities at cost to the organization. At the time of approval to sell publications by the Office of Organizations and Activities, arrangements shall also be made to provide for the deposit of funds collected into the SOF account.

Regulations for the vending of publications by registered student organizations are as follows:

a. The Chicago Circle Center Board is responsible for space assignment in the Chicago Circle Center for the vending of publications subject to review by the Chancellor, who may refer it to the Use of Facilities Committee.

b. Vending of publications in all other indoor areas is excluded except that space for such vending will be available by reservation in the following building lobbies—BSB 100B, A&A 1550, SES 200A, and PEB 130 and 230, by written authorization.

c. Vending of publications will be permitted outside all building entrances if such vending does not interfere with University activities and satisfies safety requirements, e.g., does not block entrances, and does not interfere with pedestrian traffic.

d. Subject to (c) above, such vending will be permitted by written authorization at all outdoor locations except those reserved by another organization, University department, etc. for a meeting or special event. Vending may be permitted at such reserved outdoor locations only with written permission from the organization reserving the space in addition to the Office of Organizations and Activities.

e. Vending of publications will be permitted in indoor spaces reserved by student organizations with written permission from the organization reserving the space in additon to the Office of Organizations and Activities.

C. *Free Distribution of Visuals*

1. *Distribution of Handout*

a. All material distributed by handout must identify the issuing persons or organizations. Such materials may be distributed only by Chicago Circle faculty, staff, or students. Persons circulating such materials must furnish their identification upon request of appropriate University officials, as required in Part V, Section E of the Student Code.

b. On-campus distribution of such printed materials is permitted if such distribution does not interfere with the regular course of University business or with a meeting or an event, and is under the same provisions as stated above in C–1–a.

c. Except where specifically restricted, such printed materials may be distributed inside buildings, but shall be limited to the entrance foyers of buildings, and is permitted under the same provisions as stated above in C–1–a.

d. Individuals or University organizations in violation of Section C–1 will be referred to the appropriate authorities.